2021 UT App 67

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANDREW JAMES LESKY,
Appellant.

Opinion
No. 20160941-CA
Filed June 24, 2021

First District Court, Logan Department
The Honorable Brian G. Cannell
No. 141101018

Peter A. Daines, Attorney for Appellant

Sean D. Reyes and John J. Nielsen,
Attorneys for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1 After a bad break-up, Andrew James Lesky pulled a gun on his former girlfriend (the ex-girlfriend) and her then boyfriend (the boyfriend). Lesky was charged with multiple crimes, including attempted aggravated murder and aggravated kidnapping. During trial, Lesky chose to represent himself with the occasional help of an attorney (standby counsel). On the attempted aggravated murder count, the jury ultimately convicted Lesky of a lesser included offense of aggravated assault, but it convicted him as charged on the aggravated kidnapping count. Lesky now appeals through counsel, arguing that those two convictions should have been merged, that his

right to self-representation was violated, and that the district court abused its discretion in excluding evidence. We affirm.

BACKGROUND

¶2 Lesky and the ex-girlfriend met online and began dating. For years, the two had a volatile relationship during which the ex-girlfriend claimed Lesky threatened and stalked her. The ex-girlfriend ultimately broke up with Lesky and began dating the boyfriend. According to the ex-girlfriend, Lesky then turned his anger on the boyfriend.

¶3 One October evening in 2014, tensions came to a head. The ex-girlfriend and the boyfriend were sitting on the top step of her porch when Lesky walked up the sidewalk, turned toward them, and pulled a gun from his pocket. At that point, according to the ex-girlfriend, "[Lesky] pointed the gun at us and told us to get inside." The boyfriend confirmed, "[Lesky] proceeded to tell both of us to get into the house, and we both refused several times. This went on for a while over and over, [him] trying to get us in the house and [us] refusing."

¶4 Although the ex-girlfriend was "terrified," she got up, and "stood in between" Lesky and the boyfriend, who remained seated behind her. The boyfriend testified, "[Lesky] was aiming at me and [the ex-girlfriend] was directly in between us, so [the gun was] not more than a foot away from her face." According to the ex-girlfriend, Lesky then told her "that if [she] didn't get in the house, he was going to shoot [her]," but she refused, fearing that if she did, Lesky would "kill [her] and nobody would see it."

¶5 The ex-girlfriend testified that when she did not comply, Lesky held the barrel of the gun against the left side of her forehead. She closed her eyes and thought of her children as she

"heard a click." The boyfriend also testified that, at some point during the exchange, he "heard a very distinct sound. It sounded like the firing pin went off. [It was] a very high pitch, metal on metal."

¶6 Fortunately, the firearm did not discharge. Instead, Lesky "hit [the ex-girlfriend] with the butt of the gun on [her] nose," knocking her to the ground. Lesky dropped the gun, and the ex-girlfriend grabbed it. She pointed it at Lesky and threatened to shoot him unless he left.

¶7 At that point, the ex-girlfriend saw her neighbor come around the corner. The ex-girlfriend lived on the main floor of a house, while the neighbor and his wife lived in the basement apartment of the same house. The neighbor testified that, from inside the apartment he had heard Lesky tell the ex-girlfriend to "get into the house, in a very angry tone," and he decided to come outside when he heard a "general feeling of terror" in the ex-girlfriend's voice. As the neighbor "rounded the corner, [he] saw [the ex-girlfriend] sitting on the steps of the front porch, and . . . Lesky standing a short distance away facing her." The neighbor yelled at Lesky, who turned and made some sort of verbal threat in response. The neighbor testified that Lesky turned back to the ex-girlfriend and reached toward her, saying, "[G]ive me the gun." The neighbor then noticed the gun in the ex-girlfriend's hand and saw Lesky grab her in a bear hug as they struggled over the gun. The neighbor, fearing for his life, retreated to the basement apartment, locked his door, and told his wife to call the police.

¶8 During the continued struggle over the gun, Lesky picked up the ex-girlfriend under her arms and threw her toward a tree. The ex-girlfriend tossed the gun toward the boyfriend but she did not see where it landed. The neighbor testified that after he went back inside he stood by a window, listened, and heard a "click, click." He speculated that the sound was one of three

things: "a round being racked into the chamber," the gun being "dropped on the cement," or "a misfire."

¶9 Once she managed to regain her feet, the ex-girlfriend saw that Lesky and the boyfriend were fighting in the street. The ex-girlfriend saw "a shimmer of a blade" and told the boyfriend, "[H]e's got a knife." She heard Lesky say, "[D]on't make me stab you," and she "saw [him] swing the blade at [the boyfriend]. It caught him on his side." Later, the boyfriend discovered that the knife appeared to have cut through the sweatshirt he was wearing, but it did not break the skin. The boyfriend let Lesky go, and Lesky ran away down the street. The boyfriend retrieved the gun, and the ex-girlfriend called the police.

¶10 Lesky was arrested and charged in a six-count information. Count 1 charged Lesky with attempted aggravated murder, arising from the allegation that Lesky had put the gun to the ex-girlfriend's head and pulled the trigger. Counts 2 and 3 charged Lesky with aggravated kidnapping for holding the boyfriend and the ex-girlfriend, respectively, at gunpoint. Count 4 charged Lesky with aggravated assault for allegedly slashing at the boyfriend with a knife.[1] Counts 5 and 6 charged Lesky with unlawful possession of the firearm and the knife, respectively.

¶11 Several days into trial, Lesky filed a motion seeking to represent himself. After a lengthy colloquy about the risks of

---

1. On appeal, the State's brief suggests that the aggravated assault charge in count 4 was "for pistol whipping [the ex-girlfriend]." But in closing argument, the prosecutor said "[Lesky] is charged with aggravated assault with a knife. We know he used a knife; he slashed [the boyfriend's] hoodie." In rebuttal, the prosecutor reiterated: "Count four, ag assault, That's for the slash. That's for the slash."

self-representation and the role of standby counsel, the court found that Lesky knowingly waived his right to counsel and allowed him to represent himself with the assistance of standby counsel. [2] For security reasons, the court suggested Lesky remain at counsel table during trial, but Lesky objected, indicating that he "would like to be allowed to be at the podium" where he could turn and address the jury. The court granted the request on the condition that approaching a witness with exhibits would be done by standby counsel; Lesky indicated that was agreeable. Lesky also asked how to make a record of any concerns that arose during trial. The court advised him, "You can call for a break outside the purview of the jury and we can make a record of those concerns . . . without the jury present."

¶12 At the end of trial, the jury was instructed on the elements of each charged offense as well as various lesser included offenses. Relevant to this appeal, on count 1, the jury was instructed on the charged offense of attempted aggravated murder as well as the lesser included offenses of attempted murder and aggravated assault. The jury acquitted Lesky of attempted aggravated murder and attempted murder, but it convicted him of aggravated assault. On counts 2 and 3, the jury was instructed on the charged offense of aggravated kidnapping and the lesser included offense of aggravated assault. The jury

---

2. When a criminal defendant elects to defend himself pro se, the court may appoint standby counsel "to aid the accused if and when the accused requests help and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. Particularly, standby counsel assists the pro se defendant in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony." *State v. Rohwedder*, 2018 UT App 182, ¶ 15, 436 P.3d 324 (cleaned up).

convicted Lesky of aggravated kidnapping on both counts, as charged. The jury acquitted Lesky of counts 4 and 6, both of which related to the knife, and convicted him of unlawful possession of a firearm on count 5. Lesky appeals.

ISSUES AND STANDARDS OF REVIEW

¶13 On appeal, Lesky first argues that the district court should have merged his aggravated assault conviction on count 1 with his aggravated kidnapping conviction on count 3. Lesky did not preserve this issue below, but contends that the district court plainly erred in not sua sponte merging the convictions. Plain error is an exception to the standard appellate preservation requirement. *State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443. A district court "plainly errs when it commits obvious, prejudicial error." *State v. Roberts*, 2019 UT App 9, ¶ 10, 438 P.3d 885.

¶14 Lesky next contends that the district court violated his constitutional right to self-representation when it conducted sidebar and in-chambers conferences outside his presence. We do not reach the merits of this claim because it is unpreserved, and Lesky has not argued any exception to the preservation requirement. *See State v. Reid*, 2018 UT App 146, ¶ 40, 427 P.3d 1261 ("When a defendant fails to raise the issue before the district court, the law of preservation controls and we review the issues under established exceptions to the law of preservation, namely, plain error, exceptional circumstances, or ineffective assistance of counsel, if the appellant argues that one of these exceptions appl[ies].") (cleaned up).

¶15 Lesky's final contention is that the district court improperly excluded evidence that he claims was admissible under rule 608 of the Utah Rules of Evidence. A district court has "broad discretion to admit or exclude evidence, and we will

disturb an evidentiary ruling only for an abuse of discretion." *State v. Samora*, 2021 UT App 29, ¶ 18, 484 P.3d 1206 (cleaned up), *petition for cert. filed*, May 19, 2021 (No. 20210347).

## ANALYSIS

## I. Merger

¶16 Lesky argues that the district court plainly erred by not merging his convictions on count 1 (aggravated assault) and count 3 (aggravated kidnapping of the ex-girlfriend). "To prevail on a claim of plain error," a defendant must show that "(i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful." *State v. Bedell*, 2014 UT 1, ¶ 20, 322 P.3d 697 (cleaned up).

¶17 The merger doctrine, as codified in Utah's merger statute, is designed "to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Bond*, 2015 UT 88, ¶ 65, 361 P.3d 104 (cleaned up); *see also* Utah Code Ann. § 76-1-402(1) (LexisNexis 2017). "The merger statute contains two merger tests." *State v. Corona*, 2018 UT App 154, ¶ 44, 436 P.3d 174 (cleaned up). Subsection (1) "addresses whether the same criminal act forms the basis for multiple criminal charges." *Id.*; *see* Utah Code Ann. § 76-1-402(1). This is known as the same act provision. *See State v. Bowden*, 2019 UT App 167, ¶ 25, 452 P.3d 503. Subsection (3) "addresses included offenses—predominantly lesser-included offenses," *Corona*, 2018 UT App 154, ¶ 44 (cleaned up), and is known as the lesser included offense provision, *see Salt Lake City v. Josephson*, 2019 UT 6, ¶ 24, 435 P.3d 255; *see also* Utah Code Ann. § 76-1-402(3). Lesky argues that merger was plainly required under both provisions.

A.    "Same Act" Analysis

¶18    Lesky first contends that the district court plainly erred by failing to merge his aggravated assault conviction under count 1 with his aggravated kidnapping conviction under count 3, arguing that "both convictions [were] based on the same act." Because we conclude that the two charges were not based on the same act, the district court did not commit error, much less plain error, by not merging the convictions.

¶19    The same act provision of Utah's merger statute provides, in relevant part,

> A defendant may be prosecuted in a single criminal action for all separate offenses arising out of a single criminal episode; however, when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision.

Utah Code Ann. § 76-1-402(1). "The clear intent of this section is that a defendant may not be punished twice for the same act." *State v. Casey,* 2001 UT App 205, ¶ 16, 29 P.3d 25 (cleaned up), *aff'd,*2003 UT 55, 82 P.3d 1106. Therefore, to assess whether the provision applies, "we must determine if the conduct supporting" the two charges constitutes the "same act" or independent acts. *See id.* (cleaned up). "[A]cts are independent if they are in no way necessary to each other or [are] sufficiently separated by time and place." *Id.* ¶ 17.

¶20    For example, in *State v. Casey,* 2001 UT App 205, 29 P.3d 25, the defendant was charged with aggravated assault and attempted murder. *Id.* ¶ 5. The defendant had pointed a gun at the victim who was seated in a parked car in a driveway. *Id.*

¶ 18. When the defendant put the gun down, the victim fled into the house. *Id.* A few minutes later, after the victim returned to the car, the defendant backed his own car out of the driveway and fired the gun at the victim while driving away. *Id.* ¶ 19. The aggravated assault charge was based on pointing the gun at the victim and was completed when the victim fled into the house. *Id.* ¶ 18. In contrast, the aggravated murder charge was based on the defendant discharging the gun as he drove away. *Id.* ¶ 19. We held that the merger statute's same act provision did not apply because "the aggravated assault and attempted murder were in no way necessary to each other and were separated by time, place, and intervening circumstances." *Id.* ¶ 20.

¶21    In our case, Lesky contends that "both counts arose from the same criminal transaction," namely, that Lesky "walked up to the [ex-girlfriend and the boyfriend,] point[ed] a gun at them, ordered them inside the house, held the gun to [the ex-girlfriend's] head, threatened her, and pulled the trigger." Lesky argues that the aggravated assault was necessary to the aggravated kidnapping because Lesky held the ex-girlfriend at gunpoint while threatening her. In contrast, the State contends that "[t]he aggravated kidnapping was based on Lesky's pointing the gun at [the ex-girlfriend] and ordering her into the house" whereas "the aggravated assault was based on his putting the gun to her head and pulling the trigger."

¶22    These two offenses "were in no way necessary to each other." *See id.* The aggravated kidnapping of the ex-girlfriend, count 3, was accomplished when Lesky held the ex-girlfriend at gunpoint, thereby restricting her movements.[3] The aggravated

---

3. A person commits aggravated kidnapping by using a dangerous weapon "in the course of committing unlawful detention or kidnapping." Utah Code Ann. § 76-5-302(1)(a) (LexisNexis Supp. 2020). A person commits unlawful detention

(continued…)

assault, count 1, was accomplished by putting the gun to the ex-girlfriend's head and pulling the trigger.[4] That separate act was not the means by which the kidnapping was accomplished—each element of aggravated kidnapping was satisfied when Lesky restricted the ex-girlfriend's movements by holding her at gunpoint.

¶23    In addition, time and circumstances separate the two acts. The ex-girlfriend and the boyfriend were sitting on the porch when Lesky approached, drew a gun, and unlawfully detained them against their will, accomplishing the aggravated

_____

(…continued)
by "intentionally or knowingly, without authority of law, and against the will of the victim, detain[ing] or restrain[ing] the victim." *Id.* § 76-5-304(1). Unlike kidnapping, unlawful detention does not require the victim to be detained or restrained for a "substantial period of time." *Cf. id*. § 76-5-301 (2017).

4. Lesky claims that the jury's verdict acquitting him of attempted aggravated murder on count 1 "demonstrates that the jury either did not believe Lesky actually pulled the trigger or, at the very least, that the State failed to prove beyond a reasonable doubt that he did." No such conclusion can be drawn from the jury's verdict. The jury may have believed that Lesky pulled the trigger but did not have the requisite intent to kill the ex-girlfriend. *See State v. Casey*, 2003 UT 55, ¶ 25, 82 P.3d 1106 (holding that "attempted murder requires proof of . . . intent to kill"). Or perhaps the verdict was the result of "compromise or some leniency in favor of" Lesky. *See State v. Nunes*, 2020 UT App 145, ¶ 33 n.13, 476 P.3d 172. In any event, our analysis does not turn on whether Lesky pulled the trigger. The separate act of threatening the ex-girlfriend with the gun by holding it to her head could have supported a separate conviction, even if there was no evidence that Lesky actually pulled the trigger.

kidnapping. In response to Lesky's aggression, the ex-girlfriend stood up and placed herself between Lesky and the boyfriend, as Lesky ordered them into the house. The boyfriend testified that they "both refused several times" and that "[t]his went on for a while over and over, [Lesky] trying to get us in the house and [us] refusing." It was only after that back-and-forth that Lesky raised the gun to the ex-girlfriend's head, pressed the barrel against her temple, and pulled the trigger. That conduct was not a mere continuation of holding the ex-girlfriend and the boyfriend at gunpoint but rather an independent act. Accordingly, the district court did not err—much less plainly err—by not merging his convictions on counts 1 and 3 under the merger statute's same act provision.

### B.  Lesser Included Offense

¶24  Similar reasoning defeats Lesky's contention that the court plainly erred by not merging the same two convictions under the lesser included offense provision of Utah's merger statute. That provision states, in relevant part:

> A defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense. An offense is so included when:
>
> (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged.

Utah Code Ann. § 76-1-402(3) (LexisNexis 2017). Whether two offenses stand in a greater-lesser relationship to each other is "determined by comparing the statutory elements of the crimes as a theoretical matter and, where necessary, by reference to the facts proved at trial." *State v. Hill*, 674 P.2d 96, 97 (Utah 1983). But "even if there is overlap in the statutory elements, if the

convictions rely on materially different acts, then one crime will not be a lesser included offense of another." *State v. Peterson*, 2020 UT App 47, ¶ 20, 462 P.3d 421 (cleaned up).

¶25    Aggravated assault can be a lesser included offense of aggravated kidnapping when the same facts that prove the greater offense also prove the elements of the lesser offense. *See State v. Carruth*, 1999 UT 107, ¶ 6, 993 P.2d 869. For example, the jury was instructed on counts 2 and 3 that it had the option to convict on the lesser included offense of aggravated assault if it found that pointing the gun at the boyfriend and the ex-girlfriend, respectively, did not amount to aggravated kidnapping because those same facts could satisfy each element of aggravated assault. But "aggravated assault does not merge with aggravated kidnapping when the convictions can be supported by materially different acts." *Peterson*, 2020 UT App 47, ¶ 20 (cleaned up). The aggravated assault conviction on count 1 cannot be treated as a lesser included offense of the aggravated kidnapping conviction on count 3 because "distinct acts gave rise to each offense." *See id.* ¶ 21.

¶26    Our recent opinion in *State v. Peterson*, 2020 UT App 47, illustrates this principle. In that case, the defendant was convicted of both aggravated kidnapping and aggravated assault "after he after he repeatedly struck his wife throughout an hours-long car ride" and "prevented her from escaping." *Id.* ¶ 1. On appeal, the defendant argued that his counsel was ineffective for failing to argue that the merger statute applied. *Id.* ¶ 17. Because "the statute preclude[s] merger of offenses if the offenses were based on separate acts," the court examined whether, "based on the evidence of this case, a court would conclude that materially different acts formed the bases of the convictions and that a motion for merger under the statute would fail." *Id.* ¶ 20 (cleaned up). The court considered the defendant's "conduct in isolation to determine whether distinct acts gave rise to each offense." *Id.* ¶ 21.

¶27 Although the events were part of a single episode, the court was "able to identify two materially different acts to support the two separate convictions based on an intervening occurrence." *Id.* ¶ 26. Specifically, a jury could have reasonably found that the defendant committed aggravated kidnapping by beating his wife during the car ride while she was detained against her will and that he committed aggravated assault by beating her again after he stopped at a park. *Id.* ¶¶ 26-27. "Accordingly, Peterson could not have established that the exact same conduct supported the two convictions, precluding merger of the offenses." *Id.* ¶ 28.

¶28 Similarly here, counts 1 and 3 are not based on "the exact same conduct." Count 1 relies on evidence that Lesky put the gun to the ex-girlfriend's head and pulled the trigger, whereas count 3 relies on his initial act of detaining the ex-girlfriend at gunpoint. Even though there is overlap in the statutory elements between aggravated assault and aggravated kidnapping, the convictions are based on "materially different acts." Because the facts and evidence that established count 1 were different from the facts and evidence that established count 3, Lesky's aggravated assault conviction on count 1 was not a lesser included offense of his aggravated kidnapping conviction on count 3. The district court committed no error, plain or otherwise, by not merging the convictions.

## II. Self-Representation

¶29 Lesky next contends that, after he elected to represent himself, he was improperly excluded from sidebar conferences and in-chambers meetings, which deprived him of control over his case and violated his right to self-representation. A criminal defendant has a constitutionally protected "right to proceed without counsel when he voluntarily and intelligently elects to do so." *Faretta v. California*, 422 U.S. 806, 807 (1975); *see also State v. McDonald*, 922 P.2d 776, 779 (Utah Ct. App. 1996). "[A]lthough

[the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *State v. Bakalov*, 849 P.2d 629, 632 (Utah Ct. App. 1993) (quoting *Faretta*, 422 U.S. at 834).

¶30   If counsel is appointed to assist a self-represented defendant, the law imposes "some limits on the extent of standby counsel's unsolicited participation" at trial. *McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984). "In determining whether a defendant's [self-representation] rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *Id.*

¶31   Lesky argues that "he was excluded against his desire from several critical discussions that were central to his defense" when the district court allowed only standby counsel to participate in sidebar conferences and in-chambers meetings. The State argues, however, that Lesky "waived—or at very least did not preserve—this claim" because Lesky accepted a "hybrid" representation and did not object when his standby counsel attended those conferences on his behalf. We agree with the State.

¶32   "Once a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *Id.* at 183 (cleaned up). Here, Lesky agreed to a hybrid arrangement in which standby counsel would participate at trial. Lesky affirmatively requested the assistance of standby counsel on legal matters about which Lesky "would have no knowledge," including making and responding to objections. And Lesky agreed that he would remain at either counsel table or the podium and that only standby counsel would be allowed to

approach the witness stand. Although sidebar conferences and in-chambers meetings were never specifically discussed, Lesky invited and agreed to substantial participation by standby counsel and never expressly and unambiguously objected to standby counsel's participation.

¶33   The record reflects two instances in which standby counsel participated in sidebar conferences on Lesky's behalf. In the first instance, the court had already sustained the State's hearsay objection, but Lesky was insistent that he wanted to respond to the objection on the record. The court expressed concern about "whether it should be in front of the jury or not," prompting Lesky to ask, "Can I approach you with what I —" The court responded, "Your counsel can and then we'll deal with it." Lesky did not object. In the second instance, Lesky stopped in the middle of cross-examining a witness and asked, "Can we approach your Honor?" The court replied, "[Standby counsel] can approach. He's helping as standby with evidentiary issues." Again, Lesky did not object.

¶34   The record also reflects that the court held two in-chambers meetings with the State and standby counsel. But in both instances, Lesky was informed of what occurred and voiced no objection that standby counsel had attended the meeting on his behalf. In one instance, standby counsel asked in open court whether there were time limits on closing arguments, and the court reminded him that they had "[t]alked about that in chambers" and that the arguments should "not extend more than an hour." Lesky did not object, either to the time limit or to the fact that the matter had been discussed outside his presence.

¶35   Lesky argues that the second in-chambers meeting was "[o]f most concern." In that meeting, the attorneys "discussed whether new exculpatory evidence had been found and whether a witness should be called by the defense in order to testify to it." Afterward, Lesky was informed of the discussion and,

believing that the testimony would be favorable to his defense, asked the State to call the witness in rebuttal. Unfortunately, there had been a miscommunication about the substance of the witness's testimony. Once the witness began testifying and it became clear that the testimony was not as expected, Lesky interjected, "Your Honor, I'd like to object real quick. Can we excuse the jury for a second?"[5] The court did so, allowing Lesky to fully argue his objection on the record, which resulted in the testimony being stricken. But importantly, throughout the entire exchange, Lesky never raised an objection to standby counsel having participated in the meeting on his behalf.

¶36 Lesky agreed to standby counsel's substantial participation and thereafter did not "expressly and unambiguously . . . request that standby counsel be silenced." *See McKaskle*, 465 U.S. at 183. At the very least, by not voicing an objection, Lesky failed to preserve the issue for appeal. "The preservation requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding." *State v. Martinez*, 2021 UT App 11, ¶ 27, 480 P.3d 1103 (cleaned up). Lesky never afforded the district court that opportunity. Therefore, Lesky's objection is unpreserved, and because he does not ask us to apply any of the exceptions to our preservation rules, *see State v. Johnson*, 2017 UT 76, ¶¶ 18–19, 416 P.3d 443, we have no occasion to decide whether standby

---

5. This exchange also illustrates that Lesky was not limited to relying on standby counsel's participation at sidebar conferences. At the time of the *Faretta* colloquy, the court specifically advised Lesky that he could ask for a break if he wanted to raise a concern outside the presence of the jury. And Lesky exercised that option here, showing that he knew how to request an opportunity to personally address the court outside the presence of the jury.

counsel's participation in the sidebar conferences and in-chambers meetings would have infringed on Lesky's right to self-representation if a timely objection had been made.

### III. Exclusion of Evidence

¶37    Lesky's final argument is that the district court abused its discretion in precluding him from introducing evidence that the ex-girlfriend was arrested on drug charges during the course of the trial. Lesky argues that the evidence should have been admitted under rule 608 of the Utah Rules of Evidence, which governs evidence about a witness's character for truthfulness or untruthfulness. We conclude that the evidence Lesky sought to admit was not rule 608 evidence but was instead evidence of impeachment by contradiction and that the court acted within its discretion by excluding that evidence under rule 403.

¶38    During trial, the ex-girlfriend testified that she had struggled with abusing prescription medication in the past but was now "clean." Four days later, while the trial was still going on, she was arrested on DUI and drug possession charges. Lesky filed a written motion seeking to admit evidence of this arrest "to impugn [the ex-girlfriend's] character for truthfulness and to show she lied on the stand." The court denied the motion, concluding that rule 608(b) "precludes this type of evidence from coming in," and that the evidence would be "more prejudicial [than] probative" under rule 403.

¶39    Rule 608(b)(1) of the Utah Rules of Evidence generally prohibits the admission of "extrinsic evidence . . . to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," but does allow a party to inquire into such instances on cross-examination "if they are probative of the character for truthfulness or untruthfulness of . . . the witness." This rule "does not apply to evidence used to directly rebut a witness's testimony or other

evidence" and leaves "the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403." *State v. Thompson*, 2014 UT App 14, ¶ 29, 318 P.3d 1221 (cleaned up).

¶40 The ex-girlfriend's drug-related arrest was not a specific instance of conduct probative of her "character for truthfulness or untruthfulness." *See* Utah R. Evid. 608(b). Rather, the evidence was probative because of its tendency to impeach the ex-girlfriend by contradiction—that is, by suggesting that she lied on the stand when she claimed to be "clean." Because the evidence was offered to rebut the ex-girlfriend's testimony and "does not go to [her] general character for truthfulness, it is not the type of evidence contemplated under rule 608." *See State v. Corona*, 2018 UT App 154, ¶ 21, 436 P.3d 174.

¶41 And because rule 608(b) does not apply, we turn to the district court's alternative basis for excluding the evidence under rule 403. That rule allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. In opposing Lesky's motion to admit evidence of the ex-girlfriend's arrest, the State specifically raised a rule 403 objection, and standby counsel responded to the objection, addressing both the probative value and the risk of prejudice. In denying the motion, after having first addressed rule 608(b), the court turned to rule 403:

> In addition, I am finding that it'd be more prejudicial [than] probative as it relates to drug use because it seemed in your statement that you're more interested in painting a picture of [the ex-girlfriend] as a drug user, which she's already—

> which we've already heard, and that would simply
> be duplicative and a waste of the Court's time and
> a waste of this jury's time as we go forward. So I'm
> ruling against the motion.

¶42    Lesky contends that the district court "applied the
standard incorrectly" because it found the evidence to "be more
prejudicial [than] probative." To exclude otherwise relevant
evidence under rule 403, the probative value must be
"substantially outweighed" by "unfair prejudice" or one of the
other enumerated dangers. *Id.* And while the district court
misstated the standard during its oral ruling, we are confident
that the district court "knows the rule 403 standard" and "was
only using shorthand." *See Northgate Village Dev., LC v. Orem
City*, 2019 UT 59, ¶ 35, 450 P.3d 1117. To reverse based solely on
the court's imprecise articulation of the standard would elevate
form over substance. "And more fundamentally, 'appellate
review of evidentiary decisions' should only 'assess whether the
district judge made an error *in admitting or excluding the evidence
in question*' and should thus affirm so long as the trial court made
the 'right decision,' even if it was for 'a mistaken reason.'" *See
State v. Wright*, 2021 UT App 7, ¶ 41, 481 P.3d 479 (quoting *State
v. Thornton*, 2017 UT 9, ¶¶ 51, 53, 391 P.3d 1016).

¶43    Under the correct articulation of the rule 403 standard, we
have no trouble concluding that the district court acted within its
discretion in excluding the evidence of the ex-girlfriend's post-
testimony arrest. Whether the ex-girlfriend was, in fact, "clean"
at the time of trial was immaterial to the charged crimes. The
evidence was relevant only to the extent it could impeach the ex-
girlfriend by contradicting her testimony that she was no longer
abusing prescription drugs. And as the State points out, the
evidence would not have established that she necessarily lied on
the stand—her drug-related arrest did not prove that she was
using drugs when she testified four days earlier. That minimal
probative value was substantially outweighed by the waste of

time entailed in recalling the ex-girlfriend to potentially impeach her on an entirely collateral matter as well as by the cumulative nature of the evidence "painting a picture of [the ex-girlfriend] as a drug user." The district court acted within its discretion in excluding the evidence where the dangers the court identified substantially outweighed the probative value of the evidence.

CONCLUSION

¶44 We conclude that the district court did not plainly err when it did not act sua sponte to merge Lesky's convictions for aggravated kidnapping and aggravated assault, either under a same act analysis or a lesser included offense analysis. We further conclude that Lesky's contention regarding standby counsel's participation in sidebar conferences and in-chambers meetings was unpreserved, and we decline to consider it because he does not ask us to apply an exception to our usual preservation rules. Finally, we conclude that the district court acted within its discretion in refusing to allow Lesky to recall the ex-girlfriend to potentially impeach her earlier testimony with evidence of a subsequent drug arrest. Accordingly, we affirm.

_____