**2023 UT App 101**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF D.A.M.G.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

STATE OF UTAH,
Appellee,
*v.*
D.A.M.G.,
Appellant.

Opinion
No. 20210625-CA
Filed August 31, 2023

Third District Juvenile Court, Salt Lake Department
The Honorable Steven K. Beck
No. 1189685

Monica Maio, William R. Russell, Hannah Welch,
and Hilary S. Forbush, Attorneys for Appellant

Sean D. Reyes and Emily Sopp,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1     D.A.M.G. (D.M.)—a minor—and a friend, J.T., decided to skip their morning high school classes and go to J.T.'s house. Courtney,[1] a classmate, joined them. While in J.T.'s room, D.M. and J.T. sexually assaulted Courtney, with D.M. unzipping Courtney's jacket and touching her breasts over and under her

---

1. A pseudonym.

bra.[2] After Courtney begged D.M. to let her go, he stopped touching her. But then J.T. told D.M. to hold Courtney down, and D.M. did so while J.T. continued sexually assaulting Courtney. D.M. also touched Courtney's breasts again after he began holding Courtney down at J.T.'s direction.

¶2 After a trial, the juvenile court found that D.M. had committed aggravated sexual assault and aggravated kidnapping and accordingly adjudicated D.M. delinquent. D.M. then moved to amend the judgment and findings. D.M. argued that the aggravated kidnapping charge merged with the aggravated sexual assault charge because the charged conduct did not involve separate acts. The court found that D.M. committed separate acts amounting to both aggravated sexual assault and aggravated kidnapping. Accordingly, the court denied D.M.'s motion. D.M. now appeals. We agree with the juvenile court that D.M.'s actions constitute separate acts that satisfy the elements of each charge. Therefore, we affirm.

BACKGROUND[3]

¶3 One day, Courtney met up with two supposed friends, D.M. and J.T., and decided to join them in skipping their morning classes and going to J.T.'s house. As the group walked from the school to J.T.'s house, J.T. told Courtney that "they were going to run a train on" her.[4] She didn't understand and asked what that

---

2. Courtney's jacket doubled as her shirt.

3. "In an appeal from a bench trial in juvenile court, we view the evidence in the light most favorable to the juvenile court's ruling, and we recite the facts here with that standard in mind." *In re J.R.H.*, 2020 UT App 155, n.1, 478 P.3d 56 (cleaned up).

4. This slang term "refers to when multiple men have sex with a woman one after the other, with or without consent." *See Run*

(continued…)

meant, and "they said that [she] would find out at the house." When they reached the house, they went upstairs to J.T.'s bedroom, where J.T. slapped Courtney on the buttocks. Courtney told J.T. not to do that again. The group then went outside, where they smoked marijuana. After some time, they went back up to J.T.'s room.

¶4     When back in J.T.'s room, J.T. began playing video games while Courtney sat on the edge of the bed and D.M. sat on a couch. J.T. complimented Courtney's pants, and Courtney "awkwardly said thank you." The next thing Courtney knew, she was on the other side of the bed with D.M. on the "upper half of [her] body" and J.T. "on the other half of [her] body." "D.M. was trying to unzip [her] jacket so he could touch [her] breasts," and J.T. "was trying to unzip [her] pants so he could touch" her vagina. Despite Courtney's efforts to fight back, D.M. touched her breasts both over and under her clothes. At trial, she gave the following testimony in response to questioning by the prosecutor:

> Q: And at any point did he hold you down, or anything like that?
>
> A: When [J.T.] would tell him to.
>
> Q: And did you ever ask the boys to let you leave?
>
> A: D.M.
>
> Q: And did he let you leave?
>
> A: He would for a second.
>
> Q: When you say that he would, what would he do?

---

*Train*, Dictionary.com, https://www.dictionary.com/e/slang/run-train/ [https://perma.cc/7FPV-NAXW].

A: He would just stop and look at me.

Q: And you said that you'd ask him to stop and he would, just for a minute. . . . [W]hen would he continue?

A: When [J.T.] would ask him to.

Q: And what would he do when he kept going?

A: Continue what he was doing.

Q: And was that touching your breasts and holding you down?

A: Yes.

In later testimony, Courtney stated that D.M. had "started helping" her off the bed after she "beg[ged] him to stop" but then he held her down after J.T. told him to.

¶5 Courtney also testified that J.T. put a condom on and, as he did so, said, "This is what run a train means." D.M. then said he too was going to put a condom on. But Courtney then saw an opportunity to try to escape and attempted to run from the room. In doing so, however, she tripped over J.T.'s weights, and J.T. grabbed her. She went to the corner where D.M. was then sitting on the couch, and J.T. grabbed his belt and started hitting her with it, while D.M. looked on without attempting to intervene.

¶6 At that point, J.T. realized that his mother would be home soon, and he and D.M. grabbed their belongings and started walking back to school. Courtney zipped up her jacket and pants, put on her shoes, and also started walking back to school, leaving some distance between the boys and herself, though she could see them acting "[a]s if it was a joke." Once back at school, Courtney told a friend what had happened and then went into the bathroom and cried.

¶7    Within the next couple of days, Courtney had a conversation with D.M. over Snapchat, and she took pictures of the messages. These photos were admitted at trial, and Courtney read portions aloud. Their conversation, in relevant part, read as follows:

> D.M.: [Were] u sad we did dat shit
>
> Courtney: [I]t got me depressed ya.
>
> D.M.: Why though[?] We ain't gonna do dat shit no more
>
> Courtney: [I]magine shit happened to you in your past . . . and then one day you trust 2 boys and your like in your head they playing they playing and I get hit with a belt[,] I get punched, I get held down [and] touched while I'm fighting y'all saying stop and begging you to stop
>
> D.M.: Damn fuck we fucked up forgive us for dat shit u my homegirl[.] And I didn't punch u or hit u[.] I mean we still friends we just ain't gonna say dat shit no more
>
> Courtney: [N]ot you but [J.T.] hit me
>
> D.M.: Damn ok but u forgive us we didn't know dat shit happened too u
>
> Courtney: [I]t's kinda hard[.] I know at the moment y'all weren't thinking, but [I don't know]. I told you guys and y'all didn't stop
>
> D.M.: Well we stopped but we was playing wit u but we didn't know dat happened and I was tryna be

easy on u[.] But you should still kick it wit us[.] And be friends only

Courtney: [T]hat isn't playing when your begging them to stop and they don't and keep holding you down and y'all laughing while doing it and not giving a shit bout how I feel[.] [H]ow would you feel if that happened to you

After investigation, the State charged D.M. with aggravated sexual assault and aggravated kidnapping, and the case proceeded to trial.

¶8      At trial, in addition to having Courtney testify, the State called the detective who was assigned to the case. The court also admitted into evidence a photo showing bruising on Courtney's hand where the belt had struck her.

¶9      After the State rested, D.M.'s defense moved to dismiss the aggravated kidnapping charge, arguing that the State presented no evidence that D.M. restrained Courtney beyond the level of restraint necessary to commit a sexual assault. The court denied the motion, "find[ing] that there is not one act under which two different charges are being sought, but that there are separate acts, which justify each charge."

¶10      D.M. was the sole witness for the defense. He testified that after the group went outside to smoke marijuana, they listened to some music in J.T.'s room. Then D.M. went to the bathroom for a while. He testified that when he came back, Courtney "was just in a way acting weird." He also said that as it got close to lunchtime and the group needed to head back to school, J.T. was changing his clothes and Courtney kept doing something that made J.T. angry, so he hit her with the belt. He claimed that Courtney was flirting with J.T., including repeatedly touching him and sitting on his knee. D.M. asserted that he never kept Courtney in J.T.'s room without her consent, sexually assaulted her, or held her down. When asked why he apologized to her through the

messages, he said he felt bad about J.T. hitting her with the belt and about a comment he had made after she had told them while smoking marijuana that she had been raped before. He said, "I was being messed up to her about it, and I feel like she holds a grudge against me, and so that's why I said, 'My bad.'"

¶11 After hearing closing arguments, the juvenile court found Courtney's testimony to be "believable" and said that her testimony was "supported by the other evidence in the case." The court found that D.M.'s testimony was not believable and was not supported by the exchanged messages or the photo of Courtney's injuries. The court found beyond a reasonable doubt that D.M. had committed both aggravated sexual assault and aggravated kidnapping and adjudicated him delinquent on those grounds.

¶12 After trial, D.M. moved to amend the judgment and findings. D.M. argued that the aggravated kidnapping charge merged with the aggravated sexual assault charge because both charges were based on the same acts. In its order denying the motion, the juvenile court found that D.M. forcibly sexually abused Courtney while J.T. aided and abetted him (the aggravated sexual assault) and that D.M., in a separate act, held Courtney down at the behest of J.T. to aid J.T. in his sexual assault (the aggravated kidnapping) after D.M. had "a crisis of conscience and realized what he was doing was wrong." Specifically, the court found that after J.T. instructed D.M. to hold Courtney down to facilitate J.T.'s assault, D.M.'s "intent at that point had shifted from gratifying his own sexual desire to assisting his co-defendant in the co-defendant's commission or attempted commission of a felony." D.M. now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶13 D.M. asserts that "the juvenile court exceeded its discretion when it denied D.M.'s [motion] and declined to merge aggravated sexual assault and aggravated kidnapping." "We review the trial court's underlying factual findings for clear error and its ultimate

grant or denial of a motion to amend or make additional findings for abuse of discretion." *Eskelsen v. Theta Inv. Co.*, 2019 UT App 1, ¶ 22, 437 P.3d 1274. "In addition, the underlying merger issue asks a question of law, which we also review for correctness." *State v. Wilder*, 2018 UT 17, ¶ 15, 420 P.3d 1064.

ANALYSIS

## I. Merger of Aggravated Kidnapping into Aggravated Sexual Assault Under Utah Law

¶14    D.M. argues that "[w]hat the State repeatedly described is the same acts based on the same facts—a mutually assisted nonconsensual act with a detention that was both inherent to and required in order to commit the act." We first address D.M.'s insinuation that some level of detention is inherent in sexual assault and particularly in aggravated sexual assault. This position has been rejected by our supreme court,[5] and it is not supported by the relevant statutes.

---

5. Our supreme court has recognized that there are situations in which a perpetrator may sexually assault a victim without physically restraining the victim or otherwise ensuring that the victim is unable to leave. For example, in *State v. Barela*, 2015 UT 22, 349 P.3d 676, a woman testified that she "just froze" when a massage therapist allegedly penetrated her vaginally without her consent. *Id.* ¶¶ 6–7. The court said, "To determine whether a victim has truly consented, the factfinder must pay close attention to the verbal and nonverbal cues given by the victim and to a wide range of other elements of context." *Id.* ¶ 39. It expounded,

> [T]he question of consent is highly nuanced and context-dependent. Thus, the outward indicators of consent in one context may suggest nonconsent in another. A person who had previously been a victim of sexual assault might well respond to unwanted

(continued…)

¶15 In *State v. Wilder*, 2018 UT 17, 420 P.3d 1064, our supreme court rejected "the *Finlayson-Lee* test," "a common-law merger test that ha[d] its most common application in cases involving sexual assault and kidnapping." *Id.* ¶ 21 (cleaned up) (discussing and overruling *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, and *State v. Lee*, 2006 UT 5, 128 P.3d 1179). The court recounted how, in *Finlayson*, it had opined that "absent a clear distinction between sexual assault and kidnapping, . . . virtually every rape would automatically be a kidnapping as well." *Id.* (cleaned up). In line with this, it had espoused "a test for determining when a defendant's kidnaping conviction is sustainable in addition to [the defendant's] sexual assault convictions," which test required that "the prosecutor . . . show that the kidnaping detention was longer than the necessary detention involved in the commission of the sexual assault." *Finlayson*, 2000 UT 10, ¶ 19, *overruled by Wilder*, 2018 UT 17. In *Lee*, the court determined "that aggravated kidnaping is not a lesser included offense of aggravated assault" but applied "the *Finlayson* factors" to decide whether the defendant's actions of detention were "slight, inconsequential and merely incidental to" the sexual assault. 2006 UT 5, ¶¶ 33–34 (cleaned up), *overruled by Wilder*, 2018 UT 17.

---

sexual contact in a post-traumatic-stress response of "freezing." And it would be reasonable under those circumstances for a jury to infer that the victim's freezing reaction was indicative of non-consent—and of the defendant's knowledge of nonconsent if the defendant was aware of the victim's past. But that does not suggest that "freezing" would always support such a determination, since . . . it might be possible for a defendant to establish that a victim's nonparticipation indicated consent in context.

*Id.* ¶ 39 n.7; *see also In re J.F.S.*, 803 P.2d 1254, 1257 n.4 (Utah Ct. App. 1990) (highlighting "studies indicat[ing] that, while some [victims] respond to sexual assault with active resistance, others freeze"), *cert. denied*, 815 P.2d 241 (Utah 1991).

¶16 But the court in *Wilder* noted a "glaring problem[] with the reasoning of *Finlayson* and *Lee*": "neither remotely addressed the fact that the legislature has enacted a statute dictating the terms and conditions of merger of criminal offenses in this context." 2018 UT 17, ¶ 22 (cleaned up). The court continued, "We cannot see how absent the existence of a constitutional ground we can exercise common-law power in the face of a statute regulating the enterprise of merger in this field." *Id.* (cleaned up). The court further declared that "there's no constitutional basis for exercising common-law power as the double jeopardy concern is unfounded." *Id.* ¶ 23.

¶17 Accordingly, the State is no longer required to prove that a kidnapping "detention was longer than the necessary detention involved in the commission of the sexual assault." *Finlayson*, 2000 UT 10, ¶ 19. Instead, courts look to the applicable statute to determine if merger applies. *Wilder*, 2018 UT 17, ¶ 22.

¶18 Utah's merger statute codifies the merger doctrine, which is designed "to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Bond*, 2015 UT 88, ¶ 65, 361 P.3d 104 (cleaned up); *see also* Utah Code § 76-1-402(1). "The merger statute contains two merger tests." *State v. Corona*, 2018 UT App 154, ¶ 44, 436 P.3d 174 (cleaned up), *cert. denied*, 437 P.3d 1249 (Utah 2019). Our court has previously explained the two merger tests as follows: "Subsection (1) addresses whether the same criminal act forms the basis for multiple criminal charges. This is known as the same act provision. Subsection (3) addresses included offenses— predominantly lesser-included offenses, and is known as the lesser included offense provision." *State v. Lesky*, 2021 UT App 67, ¶ 17, 494 P.3d 382 (cleaned up), *cert. denied*, 497 P.3d 830 (Utah 2021); *see also Corona*, 2018 UT App 154, ¶ 44; Utah Code § 76-1-402. Only the first test is at issue here.

¶19 Utah Code subsection 76-1-402(1) declares that "[a] defendant may be prosecuted in a single criminal action for all separate offenses arising out of a single criminal episode;

however, when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision." This indicates that our inquiry is not whether D.M. detained Courtney beyond what the sexual assault required—again, we are not convinced that a sexual assault requires any detention—but whether D.M.'s actions constituted the same act or different acts.[6]

## II. Whether D.M.'s Actions Constituted "the Same Act"

¶20     We do not agree with D.M. that his actions composed a single act such that the court's findings as to aggravated sexual assault and aggravated kidnapping should be merged.

¶21     "Acts are independent if they are in no way necessary to each other or are sufficiently separated by time and place." *State v. Lesky*, 2021 UT App 67, ¶ 19, 494 P.3d 382 (cleaned up), *cert.*

---

6. We are also unconvinced by D.M.'s intimation that the act of holding down a victim while committing a sexual assault is necessarily "the same act," *see* Utah Code § 76-1-402(1), as the assault. These actions are both undeniably part of a "single criminal episode." *See id.*; *see also id.* § 76-1-401 ("'[S]ingle criminal episode' means all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective."). But the act of sexually assaulting and the act of holding a victim down may well—depending on the circumstances—be different acts "incident to an attempt or an accomplishment of a single criminal objective": that of sexually assaulting the victim. *See id.* Indeed, the relevant statute defines "[a]ct" as "a voluntary bodily movement," *see id.* § 76-1-101.5(1), and the voluntary bodily movements associated with holding someone down and sexually assaulting that person may be distinct. But we need not decide this question in this case because, as we explain, we have no difficulty concluding that D.M. performed different acts when he stopped assaulting Courtney and then subsequently held her down at J.T.'s behest.

*denied*, 497 P.3d 830 (Utah 2021). In *Lesky*, the defendant contended that both his aggravated assault conviction and his aggravated kidnapping conviction "arose from the same criminal transaction, namely, that [he] walked up to [his] ex-girlfriend and [her] boyfriend, pointed a gun at them, ordered them inside the house, held the gun to the ex-girlfriend's head, threatened her, and pulled the trigger." *Id.* ¶ 21 (cleaned up). The defendant argued "that the aggravated assault was necessary to the aggravated kidnapping because [he] held the ex-girlfriend at gunpoint while threatening her," but the State responded that "the aggravated kidnapping was based on [the defendant's] pointing the gun at the ex-girlfriend and ordering her into the house[,] whereas the aggravated assault was based on his putting the gun to her head and pulling the trigger." *Id.* (cleaned up). This court agreed with the State, concluding that the two offenses "were in no way necessary to each other" because "the aggravated kidnapping of the ex-girlfriend . . . was accomplished when [the defendant] held the ex-girlfriend at gunpoint, thereby restricting her movements" and "the aggravated assault . . . was accomplished by putting the gun to the ex-girlfriend's head and pulling the trigger." *Id.* ¶ 22 (cleaned up). The *Lesky* court emphasized that the "separate act was not the means by which the kidnapping was accomplished—each element of aggravated kidnapping was satisfied when [the defendant] restricted the ex-girlfriend's movements by holding her at gunpoint." *Id.*

¶22 We reach a similar conclusion here. The record is clear that Courtney begged D.M. to stop, that he then stopped assaulting and restraining her, and that, afterward, he held her down at J.T.'s direction. Courtney testified to these facts, even stating that D.M. "started helping" her off the bed before restraining her again at J.T.'s behest. At the point that D.M. ceased his initial assault and detention of Courtney, all the elements of aggravated sexual assault had been satisfied. *See* Utah Code § 76-5-405(2)(a)(iii) ("An actor commits aggravated sexual assault if . . . in the course of a rape, object rape, forcible sodomy, or forcible sexual abuse, the actor . . . is aided or abetted by one or more persons."); *id.* § 76-5-404(2)(a)(i)(B) ("[A]n actor commits forcible sexual abuse if

. . . without the consent of the individual, the actor . . . touches the breast of another individual who is female . . . .").

¶23   Courtney testified that after D.M. stopped assaulting her, he held her down again when J.T. told him to. If D.M. did so in order to assist J.T. so that J.T. could sexually assault Courtney, then doing so was a distinct act providing the grounds for D.M.'s aggravated kidnapping charge. *See id.* § 76-5-302(2) ("An actor commits aggravated kidnapping if the actor, in the course of committing unlawful detention or kidnapping[,] . . . acts with the intent to . . . commit a sexual offense . . . ."); *State v. Briggs*, 2008 UT 75, ¶ 13, 197 P.3d 628 ("To show that a defendant is guilty under accomplice liability, the State must show that an individual acted with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense.").

¶24   The court stated that it "ha[d] no doubt that after forcibly sexually abusing [Courtney] while being aided or abetted by his co-defendant, [D.M.] had a crisis of conscience and realized what he was doing was wrong." It found that his "intent at that point had shifted from gratifying his sexual desire to assisting his co-defendant in the co-defendant's commission or attempted commission of the felony." D.M. argues that this finding as to a shift in his intent was against the clear weight of the evidence. We disagree. The record bears out the conclusion that D.M. again placed his hands on Courtney—after removing them—*for the purpose* of assisting J.T. As the court stated, D.M. "evidenced his shift in intent when, after [Courtney] begged him to, he stopped, looked at [her], and let her go for a second." Courtney's testimony, which the court found to be "believable," was that D.M. then resumed his previous actions *only* when J.T. told him to do so. She indicated that he "let [her] go, but then it was [J.T.] who was directing." We agree with the court that this testimony is sufficient to support the juvenile court's finding that when D.M. resumed touching Courtney, he did so with the intent to aid J.T. in J.T.'s sexual assault.

¶25 Moreover, we agree with the court that other evidence corroborated this shift in intent, namely D.M.'s subsequent Snapchat messages to Courtney. The court noted that "[w]hile [D.M.] repeatedly referred to his and his co-defendant's actions by saying 'we' throughout the text thread, he only referred to himself when he said, 'I was tryna be easy on u.'" This message contains D.M.'s own admission of what he was trying to do and indicates that he acted intentionally to go "easy" on Courtney. D.M. asserts that the message "is ambiguous at best and could mean any one of many things." He argues that this statement could refer to him not participating in punching Courtney or hitting her with the belt when she tried to flee. Or, he contends, it could refer "to the fact that after [Courtney] broke free, [D.M.] abandoned the sexual assault entirely, even though J.T. continued his assault on [her]."

¶26 But while D.M. said earlier in the exchange "I didn't punch u or hit u," that does not appear to be what he was discussing here, nor does it appear that he is referencing the point where he ceased assaulting Courtney after she tried to flee. In the message previous to this one, Courtney said, "I know at the moment y'all weren't thinking, but . . . I told you guys and y'all didn't stop." D.M. responded, "Well we stopped but we was playing wit u but we didn't know dat happened and I was tryna be easy on u." His statement refers to a point where "we"—both he and J.T.—stopped. Because no party asserts that J.T. stopped his assault earlier, this can only mean the end of the attack when the boys realized J.T.'s mother would be returning and grabbed their belongings to return to school. And D.M.'s statement that "we was playing wit u"—again plural—must refer to a shared understanding with J.T. throughout the attack that Courtney was to be assaulted in some sort of twisted version of "playing." Within this context, D.M.'s choice of the singular in his statement "I was tryna be easy on u" means that he—and not J.T.—was trying to go "easy" on her before the point that the attack finally ended and even before she tried to flee and J.T. hit her. Therefore, the only possible readings are that D.M. was trying to go "easy" on Courtney the whole time or that at some point during the

attack he decided to do so. Because D.M. does not assert the former and because the latter is corroborated by Courtney's testimony, we find the court's reading to be the most natural and persuasive of the various interpretations presented.

¶27    We have no reason to believe that D.M.'s desire for sexual gratification gave him any reason to go "easy" on Courtney. Instead, this comment substantiates the court's finding that D.M. experienced "a crisis of conscience." This record evidence supports the court's finding as to a shift in D.M.'s intent. Accordingly, the court did not commit clear error in making this factual finding. And whether D.M.'s intent ever shifted again to fulfilling his own sexual gratification is immaterial to our inquiry because, at the point that it shifted to aiding J.T. and that D.M. held Courtney down for this purpose, D.M. committed aggravated kidnapping.

¶28    This act constituting aggravated kidnapping was separate from the act constituting D.M.'s own sexual assault of Courtney. *See Lesky*, 2021 UT App 67, ¶ 19. Like in *Lesky*, the two charges were accomplished at different points in the criminal episode. *See id.* ¶ 22. We therefore conclude that the sexual assault "was not the means by which the kidnapping was accomplished," rather, "each element of aggravated kidnapping was satisfied when" D.M. held Courtney down at J.T.'s direction for J.T. to assault her after the above-described shift in intent, and each element of aggravated sexual assault was satisfied before that shift when D.M. sexually assaulted Courtney with the assistance of J.T. *See id.* And while the *Lesky* court also determined that "time and circumstances separate[d] the two acts" there, *see id.* ¶ 23, and we do not delve into the question of whether that is true here, acts need only satisfy one of these conditions to be classified as independent, *see id.* ¶ 19 ("Acts are independent if they are in no way necessary to each other *or* are sufficiently separated by time and place." (cleaned up) (emphasis added)). D.M.'s act of holding Courtney down for J.T. to assault her was "in no way necessary to" his act of assaulting her for his own sexual gratification before his intent shifted. *See id.* (cleaned up). Accordingly, we have no

difficulty concluding from the record evidence that D.M. committed at least two distinct acts and that these separate acts satisfied the separate charges. Therefore, the court was right not to merge D.M.'s charges.

## CONCLUSION

¶29    The court was correct in declining to merge D.M.'s aggravated sexual assault and aggravated kidnapping charges because D.M. committed separate acts satisfying the elements of both charges. Consequently, the court acted within its discretion when it denied D.M.'s motion. We affirm.

——————