2018 UT App 204

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
WILFREDO CANTARERO,
Appellant.

Opinion
No. 20160711-CA
Filed October 25, 2018

Third District Court, West Jordan Department
The Honorable Heather Brereton
No. 151402227

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES KATE A. TOOMEY and JILL M. POHLMAN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Defendant Wilfredo Cantarero appeals from his convictions of two counts of aggravated sexual abuse of a child. He argues that he received constitutionally ineffective assistance of counsel because his counsel failed to object to a jury instruction, failed to question a witness thoroughly, and failed to object to the jury reviewing certain evidence during deliberation. We conclude that Cantarero has not demonstrated ineffective assistance of counsel. Accordingly, we affirm.

BACKGROUND[1]

¶2    In preparation for a Fourth of July camping trip, Cantarero and his wife (Wife) invited Wife's two sisters and their families to the house to clean a camping trailer. One of Wife's sisters, the mother of the victims (Mother), brought her two children (Older Victim and Younger Victim) to Cantarero's house, and the second sister (Sister) brought her husband. After cleaning the trailer, Wife, both sisters, and Sister's husband stayed outside talking.

¶3    Meanwhile, inside the house, Cantarero watched television in the living room. Younger Victim entered the house to get a glass of water. When she entered the living room, Cantarero stood up, grabbed her hand with one hand, and touched her genitals under her clothes and underwear with the other hand. Younger Victim said, "[S]top" and ran back outside. After they returned home later that evening, Younger Victim told Older Victim what had happened. Both victims then approached Mother and told her about the incident with Cantarero in the living room. Older Victim also revealed that Cantarero had touched her vagina several times over approximately three or four years, beginning when she was five years old.

¶4    Following these revelations, Mother told the victims that they should not go camping because Cantarero would be going, but the victims were excited about the trip so they resolved to go. Mother and the victims drove in a vehicle separate from Cantarero and Mother warned them not to get near Cantarero.

---

1. "On appeal, we review [and recite] the record facts in a light most favorable to the jury's verdict," and we "present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

At the campsite, the three of them also stayed in their own tent. The next morning, Sister confronted Cantarero about his "touching private parts [of] little girls." He then said, "Wow, I'm so sorry. I will work on that[,]" and he told Mother that he was "very sorry." Cantarero apologized to Sister and asked her "to forgive [him] if [he] had made any mistakes with the children." Following this exchange, Cantarero and Wife packed up and left. Mother later informed the police who then began an investigation. As part of that investigation, each victim participated in recorded interviews at the Children's Justice Center (the CJC Interviews). A nurse also examined each of the victims and found no physical indicators of sexual abuse. The State charged Cantarero with two counts of aggravated sexual abuse of a child, and the case proceeded to trial.

*U Visa*

¶5     During trial, in response to a question from defense counsel, Mother testified that she learned about "U visas" as a result of the charges against Cantarero.[2] Mother explained that she signed some paperwork and provided it to an attorney, but she did not know whether the paperwork had been filed. In subsequent questioning, both the prosecutor and defense counsel returned briefly to the U visa topic. Shortly after being excused to deliberate, the jury sent out a question, asking, "[W]hat is a U visa?" Following discussion among the prosecutor, defense counsel, and Cantarero, the trial court concluded that this information could not be provided during deliberation and was irrelevant. The court sent a response to the jury, stating, "[T]he Court cannot give you any further evidence

---

2. U Nonimmigrant Status, or a U visa, is available through federal I-918 forms and provides temporary immigration benefits to victims of qualifying criminal activity. *See I-918, Petition for U Nonimmigrant Status*, U.S. Citizenship & Immigration Services, https://perma.cc/6JY4-XGGL.

at this time. You must make your determination based on the evidence you already have."

*The CJC Interviews*

¶6     The jury viewed the interviews of each victim that had been recorded at the Children's Justice Center following the report of the abuse. In closing statements, defense counsel urged the jury to watch the recorded interviews again as they deliberated because the statements made during those interviews illustrated the holes in the State's case. Counsel asserted that, although the victims testified that Cantarero touched their genitals multiple times, they could describe details of only one event each. Additionally, counsel emphasized Younger Victim's statement in the interview, particularly her explanation that Cantarero started touching her after he had stopped touching Older Victim. Counsel theorized that Younger Victim may have "heard that in a conversation or someone told her to say that, but that's a very adult evaluation." During deliberations, the jury had access to the recorded CJC Interviews of both victims.

*Jury Instruction 17*

¶7     The State proposed several jury instructions, including one at issue in this appeal—Instruction 17. The challenged instruction provided:

> In evaluating the testimony of a child you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. Although, because of age and level of cognitive development, a child may perform differently as a witness from an adult that does not mean that a child is any more or less credible a witness than an adult. You should not discount or

distrust the testimony of a child solely because he or she is a child.

A child witness shall be considered a competent witness. That child's testimony shall be evaluated in the same manner and given the same weight as another witness.[3]

¶8 Cantarero's counsel approved this instruction, and the court gave the instruction to the jury. The court also provided the jury a written copy of this instruction.

¶9 The jury convicted Cantarero on both counts of aggravated sexual abuse of a child. He appeals.

ISSUES AND STANDARDS OF REVIEW

¶10 Cantarero raises three issues on appeal, none of which were preserved below.[4] "When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an

---

3. We note that the trial court, when reading this instruction to the jury, slightly altered the last sentence to read, "That child's testimony shall be evaluated in the same manner and given the same weight as *any other* witness." (Emphasis added.)

4. Cantarero also asserts that the cumulative effect of the alleged errors was prejudicial. "But if the claims are found on appeal to not constitute error, . . . the doctrine will not be applied." *State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (quotation simplified). Because Cantarero has not demonstrated—and we have not concluded—that any error occurred, the cumulative error doctrine does not apply. *See State v. Wright*, 2013 UT App 142, ¶ 44, 304 P.3d 887. Accordingly, we do not consider this argument further.

appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. Cantarero asserts his three challenges on appeal pursuant to the ineffective-assistance-of-counsel exception to preservation. *See id.* ¶ 19.

¶11 "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified). "While such a claim necessarily requires the court to look at the substantive issue the defendant argues his counsel should have raised, and whether the substantive issue had any merit, the substantive issue is only viewed through the lens of counsel's performance." *Johnson*, 2017 UT 76, ¶ 22. To prevail on an ineffective assistance of counsel claim, a defendant must show that counsel's performance was both objectively deficient and prejudiced the defense. *See State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162; *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984).

ANALYSIS

I. Jury Instruction 17

¶12 Cantarero first asserts that defense counsel was ineffective for failing to object to jury Instruction 17. He takes particular exception to that portion of the instruction stating that "[a] child witness shall be considered a competent witness." Cantarero does not contend that Instruction 17 incorrectly states the law. Instead, he argues that, by failing to provide a definition of "competent," Instruction 17 "singled out the [child victims] for the court's endorsement as competent witnesses and lent weight to their testimony."

¶13 We review the jury instructions here through the lens of ineffective assistance of counsel and we generally "review jury instructions in their entirety and will affirm when the jury instructions taken as a whole fairly instruct the jury on the law applicable to the case." *State v. Ontiveros*, 835 P.2d 201, 205 (Utah Ct. App. 1992). To prevail on an ineffective assistance of counsel claim, a defendant must establish that counsel's performance was objectively deficient and that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs." *State v. Goode*, 2012 UT App 285, ¶ 7 n.2, 288 P.3d 306. Here, we analyze only the prejudice prong and conclude that Cantarero has failed to establish a reasonable probability that—had an objection been made—the results of his trial would have been different. *See Strickland*, 466 U.S. at 694.

¶14 Considered as a whole, the jury instructions directed the jury to evaluate the testimony of a child witness in the same manner as any other witness. Specifically, the court instructed the jury on its proper role—determining the weight and credibility of each witness's testimony. *See State v. Day*, 815 P.2d 1345, 1351 (Utah Ct. App. 1991) ("It is the role of the jury to weigh the evidence and assess the credibility of the witnesses."). The court directed the jury to consider "all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development," when evaluating the child's testimony. The court further instructed the jury that a "child's testimony shall be evaluated in the same manner and given the same weight as [any other] witness." In other words, the court expressed no view on whether the child victims were telling the truth and instructed the jury to evaluate their testimony the same as it would any other witness.

¶15 Another jury instruction, Instruction 11, listed several factors for the jury to consider when weighing the credibility of a

witness, including the witness's demeanor, bias, memory, and consistency. In his closing statement, defense counsel called particular attention to the jury's role, stating, "You heard the testimony as I did. You have to judge credibility and give the weight to different testimonies that you heard." The State, in closing, also drew the jury's attention to its proper role, recommending that it review Instruction 11, which explained the factors to consider when determining witness credibility.

¶16 In light of the above, we are unpersuaded that a defense objection to Instruction 17 reasonably could have made a difference. The exclusion of the instruction that a "child witness shall be considered a competent witness" or addition of a "competence" definition—possible results of a defense objection—would not have altered, reasonably, the jury's weighing the victims' testimony. In other words, Cantarero has not established a reasonable probability of a different outcome had an objection been made. *See State v. Ott*, 2010 UT 1, ¶ 40, 247 P.3d 344.

## II. U Visa

¶17 Next, Cantarero asserts that defense counsel was ineffective in failing to ask follow-up questions regarding a witness's interest in obtaining a U visa. He argues that trial counsel should have presented further explanation of the U visa benefit, without which "the jury was left confused." Reviewing such a claim of ineffective assistance, we employ "a strong presumption that counsel was competent and effective, giving [defense] counsel wide latitude in making tactical decisions, and we will not question such decisions unless there is no reasonable basis supporting them." *State v. Goode*, 2012 UT App 285, ¶ 6, 288 P.3d 306 (quotation simplified).

¶18 Defense counsel elicited the U visa testimony from Mother on cross-examination to show a possible motive for her

and the victims to fabricate the accusations against Cantarero. The testimony emerged in the following exchange:

> COUNSEL: Did you ever talk to the police since [making a witness statement] about any kind of benefit to you, as far as this case is involved?
>
> MOTHER: No.
>
> COUNSEL: There has been no discussion of any benefit of any status or anything on this case?
>
> MOTHER: With the police, no.
>
> COUNSEL: With anybody else?
>
> MOTHER: With the therapist.
>
> COUNSEL: And what was that discussion?
>
> MOTHER: The therapist told me that because of my therapy that I could get a . . . U visa.
>
> COUNSEL: And did you know what that was before she told you about that?
>
> MOTHER: No.

Responding to defense counsel's questions, Mother testified that she did not know about the U visa before the therapist informed her. On redirect examination, the prosecutor asked whether Mother had since applied for a U Visa. Mother responded that she asked her attorney about a U visa but had not received one. When it became clear that Mother had not been awarded a U visa, defense counsel terminated this line of questioning.

¶19    Soon after it began deliberating, the jury sent the court a question, asking, "What is a U visa?" Following discussion of the question and possible responses with counsel and Cantarero, the trial court responded to the jury with a note, stating, "[T]he court cannot give you any further evidence at this time. You must make your determination based on the evidence you have heard."

¶20    We are not persuaded that counsel performed deficiently by failing to ask follow-up questions about the details or availability of a U visa for Mother. While an excursion into the landscape of immigration law may have prevented the U visa jury question, Cantarero was not prevented from exploring his theory that Mother encouraged the victims to fabricate their allegations of abuse to gain a benefit. Defense counsel left the jury with the idea that Mother was interested in a benefit associated with the accusations made in this case. Counsel successfully introduced this fabrication defense to the jury and eliciting greater detail from Mother may not have been possible or prudent under the circumstances. Counsel legitimately could have believed that further explanation of this potential immigration benefit would have undermined his effort to impeach Mother. This is a reasonable tactical decision of counsel. *See id.* The State argues, and we agree, that delving deeper into the U visa status application "risked undermining the defense-favorable inference the jury may draw" from the exchange with Mother. Indeed, further exploration also may have necessitated a presentation of the U visa's purpose, eligibility requirements, issuance, and its other contours by someone qualified to address these questions. Additionally, Cantarero offered other theories supporting the fabrication defense, so a better explanation of the U visa would have added little to his defense strategy.

¶21    We conclude that Cantarero has not shown that counsel performed deficiently by not asking additional questions of Mother about the U visa or seeking to explain it further.

### III. The CJC Interviews

¶22   Cantarero next asserts that defense counsel was ineffective when he failed to object to the jury having access to the victims' recorded CJC Interviews during its deliberations.

¶23   We have previously noted that "a child's interview taken by police for the purpose of prosecuting crime, which is then introduced at trial and subjected to live cross-examination, constitutes . . . testimony[, or is testimonial in nature,] . . . and thus should not be given to the jury during its deliberations." *State v. Cruz*, 2016 UT App 234, ¶ 38, 387 P.3d 618 (quotation simplified); *see also State v. Carter*, 888 P.2d 629, 643 (Utah 1995) (noting that rule 17 of the Utah Rules of Criminal Procedure "indicates that exhibits which are testimonial in nature should not be given to the jury during its deliberations"), *superseded by statute on other grounds as stated in State v. Ott*, 2010 UT 1, 247 P.3d 344. The Utah Supreme Court has explained:

> If the hearing lasts for any length of time and the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the memory of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room.

*State v. Davis*, 689 P.2d 5, 15 (Utah 1984) (quotation simplified).

¶24   Although the law generally constrains the jury's access to testimonial evidence, a defendant may set aside this protection in pursuit of a legitimate and advantageous trial strategy. *See State v. Kooyman*, 2005 UT App 222, ¶ 43, 112 P.3d 1252 (explaining that when "counsel's decision amounted to reasonable trial strategy or tactics, regardless of the outcome, counsel's decision will not qualify as ineffective assistance").

"[W]henever there is a legitimate exercise of professional judgment in the choice of trial strategy, the fact that it did not produce the expected result does not constitute ineffectiveness of counsel." *Ott*, 2010 UT 1, ¶ 34 (quotation simplified).

¶25 Here, each of the victims testified at trial. In addition to their testimony, the State played the recorded CJC Interviews of each victim for the jury and submitted the recordings as exhibits. Had an objection been made and sustained regarding the jury's access to the CJC Interviews during deliberations, all of the "oral evidence"—the victims' testimony, the CJC Interviews played in court, as well as Cantarero's own testimony—would likely have "faded [equally] from the memory of the jurors" as they began their deliberations. *See Davis*, 689 P.2d at 15 (quotation simplified). Instead, the jurors retained the CJC Interviews and could refresh their memories on this testimony during their discussions.

¶26 Rather than object, defense counsel insisted that the jury review the CJC Interviews during its deliberations because, in counsel's view, the recorded interviews illustrated "hole[s] in this case." Defense counsel explained that this tactic supported an important defense theory—the lack of detail regarding any other incidents could be explained by the victims fabricating the abuse allegations. Counsel also impressed upon the jury what counsel described as a "very adult evaluation" of Younger Victim's statement drawn from the CJC Interview, suggesting that Younger Victim may have been told that Cantarero began abusing Younger Victim when he stopped abusing Older Victim. Consequently, Cantarero chose to take strategic advantage of the jury's access to the CJC Interviews, and he cannot now be heard to complain about that strategic choice. *See Ott*, 2010 UT 1, ¶ 34. Moreover, because counsel's approach appears to be reasonable under the circumstances, Cantarero has failed to rebut "the strong presumption that . . . the challenged action 'might be considered sound trial strategy.'" *State v. Litherland*, 2000 UT 76,

¶ 19, 12 P.3d 92 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

CONCLUSION

¶27 Cantarero has not established that he was deprived of constitutionally effective assistance of counsel. He has not established prejudice stemming from defense counsel's failure to object to a jury instruction. Cantarero has further failed to show counsel's decision to terminate questioning a witness about a U visa and counsel's choice to allow the jury to have access to the victims' CJC Interviews during its deliberations constituted deficient performance. Accordingly, we affirm.

———————