2025 UT App 84

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALEXIS GUSTAVO RODRIGUEZ,
Appellant.

Opinion
No. 20230723-CA
Filed May 30, 2025

Third District Court, Salt Lake Department
The Honorable William K. Kendall
No. 211910188

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Tanner R. Hafen,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

TENNEY, Judge:

¶1 Alexis Rodriguez became upset at a party, and over the course of several hours, he threatened three people with a gun and detained them in distinctive ways. Rodriguez was later convicted of three counts of aggravated kidnapping and three counts of aggravated assault—with one count of each offense being linked to each of the three individual victims.

¶2 Rodriguez now challenges his convictions on two grounds. First, he argues that the district court erred by not instructing the jury on the lesser included offense of kidnapping for the aggravated kidnapping counts. Second, he argues that his aggravated assault convictions should have merged into the

aggravated kidnapping convictions; because this claim was unpreserved, he asks us to review it for either plain error or ineffective assistance of counsel. For the reasons set forth below, we reject Rodriguez's arguments and affirm his convictions.

BACKGROUND[1]

*The Events*

¶3    On the evening of August 21, 2021, Rodriguez's mother (Mother) celebrated her birthday with several friends at a nightclub, after which she and her friends returned to her home to continue celebrating with some people they'd met at the club. When the group arrived at Mother's home, Rodriguez was there drinking. A few hours later, Rodriguez became angry when he saw Mother dancing with some men that she'd brought home. Rodriguez began arguing with some of them and threatening to fight them. At that point, many of the guests at the party decided to leave.

¶4    Two of the guests, Arturo and Juan, had left the house and were in a car about to leave when Rodriguez came outside and approached them.[2] Rodriguez lifted his shirt partway, showing them that he had a gun in his pocket, and he then reached into his pocket and partially pulled the gun out in an apparent

---

1. "On appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Herrera*, 2025 UT App 1, n.2, 563 P.3d 416 (quotation simplified).

2. Aside from Rodriguez, we'll refer to the individuals involved with either descriptors relating to their relationship to Rodriguez or the events (e.g., Mother or Tenant), or instead with the pseudonyms that were used in the briefs.

demonstration that he did indeed have a gun. Rodriguez then told Arturo and Juan that they "had to go back" inside and "keep dancing" because "the party wasn't over." When doing so, Rodriguez used a "bold" and "threaten[ing]" voice. Arturo and Juan got out of the car, and Rodriguez then walked behind them as they entered the house. Arturo later testified that he did not go "willingly" but instead went back inside because he felt like he "kind of had to."

¶5     Once inside, Rodriguez "took" them into the dining room, pulled the gun out of his pocket, pointed it at each of them, and told them to sit down. Juan later testified that Rodriguez pointed the gun at his head, and Arturo later testified that Rodriguez pointed the gun at his chest for about 30 or 40 seconds. At that point, Arturo and Juan sat down as ordered. They remained sitting for a period of about "five to ten minutes," during which time Rodriguez was still "pointing the gun" at them.

¶6     Mother eventually came into the dining room, and a short time later, Nadia, who was another guest at the party, came into the dining room as well. Nadia later said that when she entered the dining room, she saw Mother arguing with Rodriguez, while Arturo and Juan were sitting in chairs and not moving. When Nadia asked Arturo and Juan why they had come back into the house, "they just looked at [her]" and "didn't say anything." She "insist[ed]" to them that they "needed to leave," but they "wouldn't move."

¶7     Rodriguez had "drunk a lot" by this point and seemed "very intoxicated." Mother told Rodriguez that he needed to leave, and when Rodriguez refused, Mother and Rodriguez began arguing. Mother "grabbed [Rodriguez] by the shirt and started to shove him," which caused Rodriguez to take his shirt off and throw it onto the floor. Mother and Nadia then began to physically push Rodriguez toward the door of the house. Nadia later testified that while they were doing so, Rodriguez pulled the

gun out and pointed it at her head. Mother and Nadia were eventually able to push Rodriguez outside the house, and they shut the door behind him.

¶8     Another guest, Joseph, was outside in his car waiting for Nadia, who was his girlfriend. Rodriguez walked over to Joseph, got into Joseph's car, and told Joseph to "take him." When Joseph objected, stating that he needed to wait for Nadia, Rodriguez pulled out his gun, pointed it at Joseph, and said, "I just told you to take me." Joseph began driving, with Rodriguez directing him where to go. During this drive, which lasted for about an hour, Rodriguez would occasionally pull the gun out, and he sometimes pointed it at Joseph's chest. Joseph later testified that Rodriguez pointed the gun directly at him "more than five or six times" as they drove. Rodriguez eventually told Joseph to pull over, at which point Rodriguez got out of the car.

¶9     Rodriguez then told Joseph to give him his shirt. When Joseph said no, Rodriguez pointed the gun at him and again demanded it. This time, Joseph took his shirt off and gave it to Rodriguez. As Rodriguez put on the shirt, Joseph sensed his opportunity, "put the car in gear[,] and took off."

¶10     Rodriguez then walked to the home of his ex-girlfriend (Ex-Girlfriend). Rodriguez told Ex-Girlfriend that Mother had kicked him out of her house, and he stayed with Ex-Girlfriend for a few hours until she left for work.

*Charges and Trial*

¶11     Rodriguez was later arrested and charged with three counts of aggravated kidnapping (one count each for Arturo, Juan, and Joseph), as well as three counts of aggravated assault (one count each for Arturo, Juan, and Joseph). The case went to trial. In the State's case, several witnesses (including Arturo, Juan, Nadia, and Joseph) testified consistently with the above.

¶12 During their testimonies, Joseph and Nadia acknowledged that, after the incidents described above, they had each applied for a U visa, which is a type of visa that gives a victim of certain crimes a pathway to legal citizenship. *Cf. State v. Cantarero*, 2018 UT App 204, ¶ 5 n.2, 437 P.3d 524 (noting that "U Nonimmigrant Status, or a U visa, is available through federal I-918 forms and provides temporary immigration benefits to victims of qualifying criminal activity"). Joseph testified that he first heard about U visas from his supervisor the day after the incidents and that he was now in the process of applying for one. Nadia likewise testified that she had learned about U visas from friends and family after she told them what happened, and she said that she had since begun the application process. A victim advocate also testified about U visas in general, and in doing so, she expressed her understanding that "there's no requirement that there has to be a gun used in a crime" to entitle an applicant to a U visa. In addition, the victim advocate testified that Mother had since begun the application process for a U visa as well.

¶13 The defense called several witnesses during its case, including Mother, a tenant (Tenant) who was living at Mother's house at the time of the party, and Ex-Girlfriend. Mother testified that she never saw Rodriguez with a gun that night, including during her argument with Rodriguez in the dining room or when she and Nadia pushed him out of the house. Tenant testified that she came out of her room when she heard Mother arguing with Rodriguez that night, that she had a view of the front door as Rodriguez was pushed out of the house, and that she didn't see a weapon on him.[3] Finally, Ex-Girlfriend testified that she did not see a gun on Rodriguez during the time that he was at her house.

---

3. During the State's cross-examination, Tenant admitted that she typically wears glasses but wasn't wearing them when she came out of her room.

¶14 Before trial, defense counsel submitted a proposed jury instruction that would allow the jury to convict Rodriguez of the lesser included offense of kidnapping for each of the aggravated kidnapping charges. After the evidence was presented at trial (but before closing argument), defense counsel renewed this request and asked the court to give the instruction, contending that the jury could conclude that Rodriguez "did all this, but maybe he didn't have a gun," which would allow it to convict Rodriguez of kidnapping as opposed to aggravated kidnapping. After hearing arguments from both sides, the court declined to give the proposed instruction, concluding that it saw no "factual basis" for the jury to convict Rodriguez of kidnapping. In the court's view, the "testimony" had been that "either he did this and he did it with a gun," or "he didn't do this at all."

¶15 Although the court did not give the proposed lesser included offense instruction for kidnapping, it did give a lesser included offense instruction for aggravated kidnapping by unlawful detention. Unlike the proposed kidnapping instruction, the lesser included offense of aggravated kidnapping by unlawful detention did not turn on whether Rodriguez used a gun. Indeed, the elements instruction for aggravated kidnapping by unlawful detention specifically included an element alleging that Rodriguez did use a dangerous weapon (which, in this case, was alleged to be a gun) during the offense. The main difference between aggravated kidnapping and aggravated kidnapping by unlawful detention was that one of the variants of aggravated kidnapping contained, as an element, that Rodriguez had detained each victim for "any substantial period of time," while the aggravated kidnapping by unlawful detention instruction contained no timing element.

¶16 For the aggravated assault charges, the court also instructed the jury on the lesser included offense of threatening with or use of a dangerous weapon.

¶17 At the close of trial, the jury found Rodriguez guilty of three counts of aggravated kidnapping and three counts of aggravated assault. Rodriguez now appeals.

ISSUES AND STANDARDS OF REVIEW

¶18 Rodriguez first argues that the district court erred when it declined to instruct the jury on the lesser included offense of kidnapping. "A trial court's refusal to grant a lesser included offense instruction is a question of law, which we review for correctness." *State v. Florez*, 2020 UT App 76, ¶ 15, 465 P.3d 307 (quotation simplified).

¶19 Second, Rodriguez argues that his aggravated assault convictions should have merged into his aggravated kidnapping convictions. Rodriguez concedes that this claim was not preserved below, but he asks us to review it for either plain error or ineffective assistance of counsel. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Suhail*, 2023 UT App 15, ¶ 69, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023). And an "ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *Id.* ¶ 72 (quotation simplified).

ANALYSIS

I. Lesser Included Offense of Kidnapping

¶20 Rodriguez first argues that the district court erred by denying his request for a lesser included offense instruction for kidnapping. We disagree.

¶21 Under Utah Code section 76-1-402(3), a "defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." A defendant is entitled to a lesser included offense instruction if (1) "the charged offense and the lesser included offense have overlapping statutory elements" and (2) "the evidence provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *State v. Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788 (quotation simplified); *see* Utah Code § 76-1-402(3)–(4).

¶22 By statute, aggravated kidnapping occurs when "the actor, in the course of committing unlawful detention or kidnapping . . . uses or threatens to use a dangerous weapon." Utah Code § 76-5-302(2)(a).[4] In the parts relevant to the charges here, kidnapping occurs when the "actor intentionally or knowingly, without authority of law, and against the will of an individual . . . detains or restrains the individual for any substantial period of time; . . . detains or restrains the individual in circumstances exposing the individual to risk of bodily injury"; or "moves the individual any substantial distance." *Id.* § 76-5-301(2)(a), (b), (e).[5] Thus, for each

---

4. Many of the statutes involved in this case—including, notably, the aggravated kidnapping and kidnapping statutes discussed here, as well as the aggravated assault and merger statutes discussed below—have been amended since the events that gave rise to this case. But because there have been no substantive changes to the elements or statutory language in question, we cite the current versions of these statutes for convenience.

5. This statutory language was reflected in the elements instructions for the aggravated kidnapping charges in this case. In those instructions, jurors were told that to convict Rodriguez of aggravated kidnapping with respect to the charges relating to Arturo, Juan, and Joseph, they must find beyond a reasonable

(continued…)

of the three aggravated kidnapping charges, the sole distinction between aggravated kidnapping and the proposed lesser included offense of kidnapping turned on whether Rodriguez used a dangerous weapon—which, in this case, was alleged to be a gun.

¶23 With this as the legal backdrop, Rodriguez argues that he was entitled to a lesser included offense instruction on kidnapping because there was a rational basis from which the jury could conclude that he didn't have (much less use or threaten to use) a gun. Rodriguez points out that Mother, Tenant, and Ex-Girlfriend each testified that they did not see him with a gun that evening. In Rodriguez's view, if the jury had believed their testimonies and thus believed that he did not have a gun, it would have had a basis to convict him of kidnapping instead of aggravated kidnapping.

---

doubt that Rodriguez "[u]sed or threatened to use a dangerous weapon," and that they must then find that he "[i]ntentionally or knowingly" "[d]etained or restrained" the victims "for any substantial period of time" or "in circumstances exposing [them] to risk of bodily injury." For the charge involving Joseph only, the instruction added the additional variant under which Rodriguez could be convicted if the jury found that he "[m]oved [Joseph] any substantial distance."

Also, for clarity, we again note that the aggravated kidnapping statute allows for conviction based on either "kidnapping" or "unlawful detention" if the offense is committed by using or threatening to use a dangerous weapon. Utah Code § 76-5-302(2)(a). As noted above, the jury here was given the option of convicting Rodriguez of aggravated kidnapping based on unlawful detention (as opposed to kidnapping), but on the verdict form, it chose to convict based on the act of kidnapping the victims with a dangerous weapon (as opposed to unlawfully detaining them).

¶24　We agree with Rodriguez that there was some evidence from which the jury could conclude that he didn't have a gun that night. But to obtain a lesser included offense instruction, Rodriguez must show that there was a "rational basis" from "the evidence" for the jury to both "acquit[] [him] of the offense charged" *and* "convict[] him of the included offense." *Powell*, 2007 UT 9, ¶ 24 (quotation simplified); *see also* Utah Code § 76-1-402(4). In *Zaragoza v. State*, 2017 UT App 215, ¶¶ 37–40, 407 P.3d 1122, for example, we considered a case in which a defendant who was charged with aggravated kidnapping asserted that he was entitled to a lesser included offense instruction for kidnapping. We disagreed. We first noted that the "evidence at trial" "overwhelmingly" showed that the defendant used a dangerous weapon, and we then held that "[t]here was simply no evidence presented at trial demonstrating that [the defendant] committed kidnapping or unlawful detention, but not aggravated kidnapping." *Id.* ¶ 39.

¶25　In denying the request at issue here, the district court reasoned that the evidence presented at trial showed that "either [Rodriguez] did this with a gun, or he didn't do it at all." On appeal, the State takes a similar view of the evidentiary picture, asserting that "there was no rational basis in the evidence to conclude that Rodriguez threatened and kidnapped his three victims, but that he did so without a gun." Having reviewed the record, we agree.

¶26　At trial, Arturo, Juan, and Joseph each testified that Rodriguez detained or controlled their movements by threatening them with a gun. And their testimonies were supported by the testimony of Nadia, who likewise testified that she saw Rodriguez with a gun (indeed, that he pointed it at her head) while she was helping Mother push him out of the house.

¶27　But Rodriguez points to no place in the record where any of the victims (or any other witness, for that matter) testified that

Rodriguez ever detained or controlled the victims' movements against their will through any threat, force, or anything else or in any manner that did not involve a gun.

¶28 As a result, when the jury heard testimony from the defense witnesses suggesting that Rodriguez did not even have a gun, the jury was presented with something of an all-or-nothing evidentiary dynamic. If the jury believed the State's witnesses and concluded that Rodriguez had a gun and detained his victims with threats involving it, the result would be convictions for aggravated kidnapping. But if the jury instead believed the defense witnesses and concluded that Rodriguez did not have a gun, there would have been no basis from the evidence that was presented for both "acquitting [Rodriguez] of the offense charged" (which was aggravated kidnapping) *and* "convicting him" of the proposed lesser included offense (which was kidnapping). *Powell*, 2007 UT 9, ¶ 24 (quotation simplified).

¶29 Rodriguez contends otherwise for several reasons, but we find none of them persuasive.

¶30 First, Rodriguez points out that jurors were instructed that they "do not have to believe everything that a witness said," but that jurors can instead "believe part and disbelieve the rest." *See State v. Hernandez*, 2024 UT App 127, ¶ 14, 557 P.3d 639 (noting that "the jury was free to believe or disbelieve all or part of" a witness's testimony (quotation simplified)), *cert. denied*, 561 P.3d 691 (Utah 2024). Fair enough. But still, to be entitled to a lesser included offense instruction, there has to be a "rational basis" from "the evidence" under which the jury could both acquit the defendant of the greater offense and convict on the lesser offense. *Powell*, 2007 UT 9, ¶ 24 (quotation simplified). So here, it's true that jurors could disbelieve the victims' claims that Rodriguez threatened them with a gun. What Rodriguez is proposing, however, moves beyond simply disbelieving the victims' testimonies. Because no witness claimed that Rodriguez detained

or restrained anyone in any manner that didn't involve a gun, Rodriguez's claim would require jurors to invent new testimony that didn't exist and surmise that there may have been some other mechanism by which he detained or restrained those victims against their will. We've been pointed to no authority that would entitle a defendant to a lesser included offense instruction in such a circumstance.

¶31 Second, Rodriguez points to evidence suggesting that he was intoxicated. But aggravated kidnapping and kidnapping have the same mens rea, *compare* Utah Code § 76-5-301(2), *with id.* § 76-5-302(2), so proof of intoxication wouldn't have provided a basis for acquitting Rodriguez of aggravated kidnapping but convicting him of kidnapping instead.

¶32 Finally, Rodriguez suggests that Joseph and Nadia had a motive to lie. Specifically, Rodriguez suggests that they may have been motivated by the possibility of obtaining U visas if it were shown that they were victims of a crime. But Rodriguez makes no similar claim about Arturo or Juan, so this alleged motive has little (if any) impact on the counts relating to them. Moreover, Rodriguez has not shown how this alleged motive would have caused Joseph and Nadia to lie about the gun itself (as opposed to lying about the alleged kidnapping more generally). Indeed, to the contrary, the victim advocate testified at trial that "there's no requirement that there has to be a gun used in a crime" for a victim to obtain a U visa.

¶33 In any event, this argument also suffers from the same problem identified above. Even if the jury were inclined to disbelieve the testimonies from Joseph and Nadia, Rodriguez would still need to show, for purposes of this claim, that there was some basis in the evidence for not just acquitting him of aggravated kidnapping, but also for convicting him of kidnapping. Even with this alleged motive for Joseph and Nadia to lie, Rodriguez still fails to point to evidence that was presented

to the jury that would show how he could have been convicted of kidnapping as opposed to aggravated kidnapping.

¶34    In short, we agree with the district court that, on the evidence presented at trial, there was no support for a finding that Rodriguez kidnapped anyone without using a gun. As a result, we see no error in the district court's denial of Rodriguez's request for a lesser include offense instruction on kidnapping.

## II. Merger

¶35    Utah's merger doctrine "is designed to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Lesky*, 2021 UT App 67, ¶ 17, 494 P.3d 382 (quotation simplified). The merger doctrine is codified in Utah Code section 76-1-402, and that statute "contains two merger tests." *State v. Corona*, 2018 UT App 154, ¶ 44, 436 P.3d 174 (quotation simplified). "Subsection (1) addresses whether the same criminal act forms the basis for multiple criminal charges," and this test is sometimes referred to as "the same act provision." *Lesky*, 2021 UT App 67, ¶ 17 (quotation simplified). "Subsection (3) addresses included offenses—predominantly lesser-included offenses," and it is sometimes referred to as "the lesser included offense provision." *Id.* (quotation simplified).

¶36    As noted, Rodriguez was convicted of three counts of aggravated kidnapping (with one count each for Arturo, Juan, and Joseph), as well as three counts of aggravated assault (with, again, one count for each of the three victims). On appeal, Rodriguez argues that the aggravated kidnapping and aggravated assault convictions should have merged under either same act merger or lesser included offense merger. Rodriguez acknowledges that this issue was not preserved, so he asks us to review it for plain error or ineffective assistance of counsel.

¶37  To demonstrate plain error, Rodriguez "must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for [him], or phrased differently, our confidence in the verdict is undermined." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (quotation simplified). To show that he received ineffective assistance of counsel, Rodriguez "must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense." *State v. Meik*, 2024 UT App 46, ¶ 31, 547 P.3d 878 (quotation simplified), *cert. denied*, 554 P.3d 923 (Utah 2024). An "ineffective assistance claim fails . . . when the proposed motion would have been futile." *State v. Rivera*, 2022 UT App 44, ¶ 24, 509 P.3d 257; *see also State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 ("[I]t is not unreasonable for counsel to choose not to make a motion that would not have been granted.").

¶38  Here, we see no basis for concluding that the court plainly erred, or, instead, that defense counsel provided ineffective assistance.

A.  Same Act Merger

¶39  The same act merger test is set forth in Utah Code section 76-1-402(1), which provides that "when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision." "The clear intent of this section is that a defendant may not be punished twice for the same act." *Lesky*, 2021 UT App 67, ¶ 19 (quotation simplified). The word "[a]ct" in this test "means a voluntary bodily movement and includes speech." Utah Code § 76-1-101.5(1). The same act merger test draws a distinction between "the same act" and "independent acts." *Lesky*, 2021 UT App 67, ¶ 19 (quotation simplified). Acts are "independent if they (1) are in no way necessary to each other or

(2) are sufficiently separated by time and place." *Id.* (numbering added, quotation otherwise simplified). And because the two conditions are separated by an "or," acts "need only satisfy one of these conditions to be classified as independent." *In re D.A.M.G.*, 2023 UT App 101, ¶ 28, 537 P.3d 250.

¶40 In Rodriguez's view, the aggravated kidnappings in this case were accomplished by the "same acts" as the aggravated assaults, thus meaning that same act merger necessarily applied. On the state of the record and the briefing presented to us, we disagree.

¶41 To determine which acts supported the charges, we start by setting forth the elements of the two offenses in question.

- **Aggravated Kidnapping.** As discussed above, the aggravated kidnapping charges required proof that Rodriguez used or threatened to use a "dangerous weapon" "in the course of committing . . . kidnapping." Utah Code § 76-5-302(2)(a). (As noted, the jury chose not to convict of the offense of aggravated kidnapping by unlawful detention.) The underlying kidnappings, in turn, required proof that Rodriguez "detain[ed] or restrain[ed]" each of his three victims "for any substantial period of time" or "in circumstances exposing the individual[s] to risk of bodily injury." *Id.* § 76-5-301(2)(a), (b). With respect to Joseph, the State could also prove the offense by showing that Rodriguez "move[d]" Joseph "any substantial distance." *Id.* § 76-5-301(2)(e).

- **Aggravated Assault.** The aggravated assault charges required proof of "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another," or "an act . . . with unlawful force or violence, that cause[d] bodily injury to another or

create[d] a substantial risk of bodily injury to another" with the use of a dangerous weapon. *Id.* § 76-5-103(2)(a), (b). Interpreting this statute, we have recently held that the act of pointing a gun in a person's direction can constitute aggravated assault, *see State v. Graydon*, 2023 UT App 4, ¶ 39, 524 P.3d 1034, *cert. denied*, 531 P.3d 731 (Utah 2023), with the "threat" component of the offense being satisfied "if a reasonable person could believe that the defendant intended to use the force in question," *State v. Brown*, 2025 UT App 31, ¶ 22, 566 P.3d 737 (quotation simplified).

¶42 We've recently discussed and applied the same act merger test in two cases—*State v. Lesky* and *In re D.A.M.G.*—and our analysis from those cases is instructive here.

¶43 In *Lesky*, the defendant (Lesky) approached his ex-girlfriend and her new boyfriend as they were sitting on her porch, pulled a gun out, pointed it at them, and then repeatedly ordered them to go inside her house. *See* 2021 UT App 67, ¶ 3. The ex-girlfriend and her boyfriend refused several times, and this "went on for a while over and over." *Id.* The ex-girlfriend then stood up and got between Lesky and her boyfriend. *See id.* ¶ 4. At that point, Lesky placed the gun against her head and pulled the trigger, but the gun did not fire. *See id.* ¶¶ 5–6. From these facts, Lesky was later convicted of several offenses—including, as relevant for our discussion here, one count each of aggravated assault and aggravated kidnapping relating to his actions toward the ex-girlfriend on the porch. *See id.* ¶ 16. On appeal, Lesky argued that it was plain error for the district court not to merge those offenses, claiming that they were committed by the same act. *See id.* ¶¶ 18, 21. But we disagreed, instead concluding that the two crimes were based on independent acts under both conditions of the test identified above. *See id.* ¶¶ 22–23.

¶44　First, we held that the two offenses "were in no way necessary to each other." *Id.* ¶ 22 (quotation simplified). We held that the aggravated kidnapping of the ex-girlfriend "was accomplished when Lesky held [her] at gunpoint, thereby restricting her movements," while the aggravated assault "was accomplished by putting the gun to [her] head and pulling the trigger." *Id.* In reaching this conclusion, we stressed that the "separate act" of putting the gun to the ex-girlfriend's head "was not the means by which the kidnapping was accomplished—each element of aggravated kidnapping was satisfied when Lesky restricted the ex-girlfriend's movements by holding her at gunpoint." *Id.*[6]

¶45　Second, we also held that the acts supporting the two charges were separated by "time and circumstances." *Id.* ¶ 23. We noted that when Lesky approached his ex-girlfriend and her boyfriend on the porch, "drew a gun, and unlawfully detained them against their will," he had "accomplish[ed] the aggravated kidnapping." *Id.* We noted that the ex-girlfriend then "stood up and placed herself between Lesky and the boyfriend," after which Lesky and his victims had a back-and-forth about whether they would go inside as ordered. *Id.* We then said that it "was only after that back-and-forth that Lesky raised the gun to the ex-girlfriend's head, pressed the barrel against her temple, and pulled the trigger." *Id.* Even though these events all occurred on the porch in something of a continuous sequence, we held that the act of putting the gun to the ex-girlfriend's head and pulling the trigger "was not a mere continuation of holding the ex-girlfriend and the boyfriend at gunpoint but rather an independent act" that was sufficiently separated so as to constitute a separate offense. *Id.* From this, we held that the "district court did not err—much less

---

6. In contrast to what happened in this case, the jury in *Lesky* seems to have convicted Lesky based on the unlawful detention (plus dangerous weapon) variant of aggravated kidnapping. *See State v. Lesky*, 2021 UT App 67, ¶ 22 n.3, 494 P.3d 382.

plainly err—by not merging" these two convictions "under the merger statute's same act provision." *Id.*

¶46 In *In re D.A.M.G.*, the defendant (D.M., who was a juvenile) was in a bedroom with a teenage girl (the victim) that he knew from high school and another friend. *See* 2023 UT App 101, ¶ 4. While there, D.M. sexually assaulted the victim; after a short pause, D.M. held her down while his friend sexually assaulted her. *See id.* ¶¶ 3–5. D.M. was later charged with both aggravated sexual assault and aggravated kidnapping, *see id.* ¶ 7, and after a bench trial, the juvenile court found that D.M. had committed both offenses, *see id.* ¶ 2. On appeal, D.M. argued that the two crimes should have merged under the same act merger statute. *See id.* ¶ 20. But we disagreed. Applying *Lesky*, we held that the "two charges were accomplished at different points in the criminal episode." *Id.* ¶ 28. We held that "each element of aggravated sexual assault was satisfied" when D.M. committed his own sexual assault before the brief pause, and we held that "each element of aggravated kidnapping was satisfied" when D.M. then held the victim down as his friend committed his own sexual assault. *Id.* (quotation simplified). We accordingly concluded that these crimes were based on separate acts because it was not "necessary" for D.M.'s own sexual assault for D.M. to then detain the victim while his friend committed his own sexual assault of her (or vice versa). *Id.* (quotation simplified).

¶47 Applying these principles to this appeal, we conclude that same act merger likewise did not apply to the charges in question—at least not to a degree that would be necessary to prevail on this unpreserved claim.

¶48 **Arturo and Juan.** As noted, Arturo and Juan testified that they were in a car and were about to leave when Rodriguez came outside, made a point of showing them his gun—i.e., he lifted his shirt and even partially pulled the firearm out of his pocket—and then ordered them to "go back" inside because "the party wasn't

over." Rodriguez then walked behind the two men as they entered the house, and he then took them into the dining room. Once in the dining room, Rodriguez pulled the gun out of his pocket, pointed it at each of them, and told them to sit down. At that point, Arturo and Juan sat down as ordered. After they did, they remained sitting for a period of about "five to ten minutes," during which time Rodriguez was still "pointing the gun" at them.

¶49    Our analysis of this portion of this claim is complicated by the fact that the jury was not given a special verdict form that asked it to decide which act formed the basis for each conviction— i.e., the jury was not asked to delineate which acts formed the basis for the aggravated kidnapping and aggravated assault convictions. And we further note that, on appeal, Rodriguez has not argued that defense counsel was ineffective for not requesting a special verdict form along these lines.

¶50    In its brief on appeal, the State has argued that the aggravated kidnappings could have been committed by Rodriguez's initial actions in which, after pointedly displaying his gun to Arturo and Juan at the car (which could reasonably be perceived as a threat involving the gun), he ordered Arturo and Juan to exit their car against their will and return to the house. For purposes of a merger analysis only, we agree with the State.

¶51    Starting with the first condition set forth in *Lesky*, Rodriguez threatened to use the gun by displaying it to Arturo and Juan at the car, and he then detained them against their will by ordering them (with, as Arturo testified, a "bold" and "threaten[ing]" voice) to go inside and then following them as they did so. And he further accomplished that end by ordering them to sit in the dining room at gunpoint. At that point, he had accomplished his criminal purpose of using the threat of gun violence to compel the two men to get out of their car and re-enter the home. As noted, after this occurred, the two men remained

sitting in the dining room for a period of "five to ten minutes," during which time Rodriguez kept "pointing the gun" at them. But this second round of gun-pointing was not necessary to the first. After all, once the two men sat down, Rodriguez had already returned them to the house against their will by threat of gun violence.[7]

¶52 Moreover, it also appears that, for purposes of the second *Lesky* condition, these offenses were "separated by time and place." *Id.* ¶ 19 (quotation simplified). Again, *Lesky* held that there was sufficient separation between events that occurred on the same porch in the same sequence, because the earlier act (pointing a gun at the ex-girlfriend and ordering her to go inside) was separated from the subsequent act (placing the gun against the ex-girlfriend's head and pulling the trigger) by a "back-and-forth" dialogue and by the ex-girlfriend standing up and placing herself between Lesky and her boyfriend. *Id.* ¶ 23. Here, the earlier acts that supported the aggravated kidnappings (Rodriguez displaying his gun, ordering Arturo and Juan inside, following them to the house, and ordering them to sit) were separated in some sense from the second "five to ten minute[]" period in which he kept them sitting at gunpoint, particularly given that most of the earlier events occurred outside the house itself.

---

7. On appeal, Rodriguez has argued that, for purposes of a merger test, the acts that occurred outside and inside the home all qualified as the "same act." But he has not meaningfully argued that, if the two sequences are separated in the manner suggested above, the earlier acts were insufficient to support an aggravated kidnapping charge. More particularly, Rodriguez has not pointed to any authority suggesting that, for purposes of an aggravated kidnapping charge, the jury could not find that the forced walk inside the house satisfied either the "substantial period of time" or "circumstances exposing the individual to risk of bodily injury" elements of the offense. *See* Utah Code § 76-5-301(2)(a), (b).

¶53    We recognize that this is a close call, and we do have some concern about whether the earlier events could support an aggravated kidnapping on their own or about whether the line between the two is quite as clear as the State suggests. But we again note that this claim is unpreserved. As a result, to show plain error, it's not enough for Rodriguez to just show error. Rather, he must show that any error was *obvious*. *See State v. Harris*, 2024 UT App 191, ¶ 36, 562 P.3d 1215 ("An error is obvious only if the law governing the error was clear at the time the alleged error was made. But an error is not obvious if there is no Utah case law addressing this specific factual scenario and the law that did exist at the time does not clearly encompass the situation in question." (quotation simplified)), *cert. denied*, 564 P.3d 961 (Utah 2025). And with respect to ineffective assistance, such a claim fails if "trial counsel could have reasonably believed that an objection was futile" "under the prevailing law at the time of trial." *State v. Ring*, 2018 UT 19, ¶ 43, 424 P.3d 845.

¶54    Here, *Lesky* was the most recent pronouncement on this test at the time of trial, and *Lesky* held that once an earlier offense is "accomplished," additional acts that constitute a new offense do not trigger same act merger. 2021 UT App 67, ¶¶ 22–23. On the state of the briefing and the arguments presented to us, and particularly given that these are unpreserved claims, we see no basis for disregarding the State's assertion that the earlier events accomplished the offense of aggravated kidnapping in a manner that was conceptually distinct from the acts that subsequently occurred during the "five to ten minute[]" period inside, which could support separate convictions for aggravated assault. We accordingly see no grounds for concluding that there was either obvious error or ineffective assistance in this regard.

¶55    **Joseph.** We reach the same conclusion with respect to the charges involving Joseph, and we do so without any hesitation. Joseph testified that Rodriguez entered his car, pulled out his gun, and told Joseph to "take him." Joseph then drove Rodriguez

around for an hour, during which time Rodriguez directed him where to turn and occasionally pulled the gun out and pointed it at him. Joseph testified that Rodriguez pointed the gun at him "more than five or six times" during the drive. At the end of the drive, Rodriguez got out of the car, pointed the gun at Joseph, and demanded Joseph's shirt.

¶56    From this, it seems clear that the commands to drive, which were accompanied by direct threats with a gun, accomplished the offense of aggravated kidnapping. When Rodriguez then got out of the car and pointed the gun at Joseph again while ordering Joseph to give him his shirt, he accomplished the offense of aggravated assault. So viewed, it was not "necessary" for Rodriguez to point the gun at Joseph outside the car to have committed the earlier offense of aggravated kidnapping, nor was it "necessary" for Rodriguez to order Joseph to drive him around at gunpoint to have committed the offense of aggravated assault. *Id.* ¶ 22 (quotation simplified). Because these were entirely separate acts, there was no basis for applying same act merger to these offenses.

B.    Lesser Included Offense Merger

¶57    Rodriguez next contends that the offenses should have merged under lesser included offense merger. As set forth in Utah Code section 76-1-402(3)(a), that version of merger states that a "defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense. An offense is so included when . . . [i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged."

¶58    "Whether two offenses stand in a greater-lesser relationship to each other is determined by comparing the statutory elements of the crimes as a theoretical matter and, where necessary, by reference to the facts proved at trial." *Lesky*, 2021 UT App 67, ¶ 24 (quotation simplified). "But even if there is overlap

in the statutory elements, if the convictions rely on materially different acts, then one crime will not be a lesser included offense of another." *Id.* (quotation simplified).

¶59　For largely the same reasons set forth above relating to same act merger, we conclude that lesser included offense merger also did not apply. As explained, the aggravated kidnapping charges relating to Arturo and Juan seem to have been based on the acts by which Rodriguez compelled them to leave the car against their will and return to the house, while the aggravated assault charges seem to have been based on Rodriguez pointing the gun at them during a second period once inside the house. And as also explained, the aggravated kidnapping charge relating to Joseph seems to have been based on the forced drive to the area of Ex-Girlfriend's house, while the aggravated assault charge seems to have been based on the act of pointing the gun at him outside the car while demanding his shirt. We accordingly see no basis for applying lesser included offense merger to these charges.

CONCLUSION

¶60　First, the district court did not err by not instructing the jury on the lesser included offense of kidnapping. Second, because we see no basis under which the aggravated assault convictions would have merged with the aggravated kidnapping convictions, we reject Rodriguez's contentions that the court plainly erred or that Rodriguez received ineffective assistance of counsel. We therefore affirm Rodriguez's convictions.

―――――――